**Byron Ashley PARKER, Petitioner,**

v.

**Tony TURPIN, Warden, Georgia Diagnostic and Classification Prison, Respondent.**

**No. Civ.A.1:96–CV–3142–RWS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 13, 1999.

---

Carmie LeeAnn McCurry, Troutman Sanders Law Firm, Atlanta, GA, Carter G. Phillips, PHV, Vincent F. Prada, PHV, Sidley & Austin, Washington, DC, for petitioner.

Paula K. Smith, Mary Beth Westmoreland, Office of State Attorney General, Atlanta, GA, for respondent.

### MEMORANDUM OPINION AND ORDER

STORY, District Judge.

This death penalty case is before the Court on a petition for writ of habeas corpus. The Court has jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254.

## I. PROCEDURAL HISTORY

On November 8, 1984, Petitioner was convicted of first-degree murder and rape in the Superior Court of Douglas County, Georgia. On the following day, Petitioner was sentenced to life imprisonment for rape and death for murder. Subsequently, Petitioner appealed his conviction and sentence and Petitioner's rape conviction was overturned; however, the remaining conviction and sentence were affirmed. *See Parker v. State*, 256 Ga. 543, 350 S.E.2d 570 (1986).

On July 24, 1987, Petitioner filed a petition for writ of habeas corpus in the Superior Court of Butts County Georgia and a motion for stay of execution. That court granted a stay. On May 2, 1995 the Superior Court of Butts County denied the petition for writ of habeas corpus. Petitioner requested a certificate of probable cause to appeal the denial; however this request was also denied. On August 22, 1996, Petitioner filed a petition for writ of certiorari to the United States Supreme Court. That petition was denied December 16, 1996. *See Parker v. Zant*, 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996). This case is before the Court on Petitioner's request for federal habeas relief. The parties waived any right to an evidentiary hearing and consented to the Court's review on the record and briefs.

## II. FACTUAL BACKGROUND

On June 6, 1984, agents of the Georgia Bureau of Investigations and the Federal Bureau of Investigations visited Petitioner's trailer home to obtain Petitioner's consent to search his home and automobile and question him regarding the disappearance of an eleven-year-old girl who lived in Petitioner's trailer park and had been missing since June 1, 1984. Petitioner signed the consent forms. Petitioner's car was towed and upon completion of the search of Petitioner's home, Petitioner and his wife were asked to come to the Sheriff's Department for further questioning. Both agreed and Petitioner maintained his innocence.

On June 7, 1984, the authorities obtained arrest warrants for Petitioner for possession of marijuana and failure to report. Later that day, Petitioner was arrested at his place of employment. The authorities wanted Petitioner to take a polygraph test at the FBI offices. Petitioner's attorney instructed him that he was not required to take the test. Petitioner took the polygraph test in the absence of his attorney. Petitioner was then returned to the jail at which time Petitioner unsuccessfully attempted to contact his counsel. Petitioner then talked to investigators again. During this time, the authorities attempted to contact Petitioner's counsel. During the early morning hours of the following day, Petitioner told authorities he had killed the missing child and drew a map identifying the location of the body. Petitioner's original counsel withdrew immediately thereafter, temporary counsel was appointed and later permanent counsel.

On July 17, 1984, Petitioner was indicted for murder, rape and kidnapping. At the preliminary hearing on July 25, 1984, Petitioner pleaded not guilty to the charges of murder and rape. A nolle prosequi was later entered on the kidnapping charge. Petitioner filed a motion to suppress his prior inculpatory statement, and the motion was denied.

At the guilt and innocence phase of the trial, defense counsel offered no evidence. The jury convicted Petitioner on both charges. During the sentencing phase, defense counsel offered the expert testimony of a psychiatrist who never met or interviewed Petitioner but who had evaluated Petitioner based on a written multiple-choice examination.

The jury found three aggravating circumstances: (1) that the murder of the victim was outrageously and wantonly vile, horrible and inhuman in that it involved torture to the victim, depravity of mind and aggravated battery to the victim; (2) that the murder of the victim was committed while the defendant was engaged in the commission of the capital felony of kidnapping with bodily injury; and (3) that the murder was committed during the commission of another capital felony: rape. The jury found that Petitioner should be sentenced to death.

On direct appeal, Petitioner's rape conviction was set aside for the failure of the trial court to instruct the jury on the charge of child molestation as a lesser included offense of rape. The aggravating circumstance associated with the commission of rape was also set aside. Petitioner's murder conviction and sentence were affirmed.

Petitioner filed a state habeas petition which was denied. Petitioner now argues he was convicted and sentenced in violation of his Fifth, Sixth, Eight, and Fourteenth Amendment rights.

## III. LEGAL ANALYSIS

A. Standard of Review [1]

Under 28 U.S.C. § 2254(d),

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Generally, "Section 2254 forbids federal courts from granting habeas relief for claims previously adjudicated by state courts, unless the state court adjudication was contrary to or represented an unreasonable application of 'clearly established Federal law, as determined by the Supreme Court of the United States.' Thus the first step in resolving a petitioner's claim is to determine the 'clearly established' law at the relevant time." *Neelley v. Nagle*, 138 F.3d 917, 922 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999). The district court determines the clearly established law at the relevant time by surveying the legal landscape to ascertain the federal law applicable to the petitioner's claim that is clearly established by the Supreme Court at the time of the state court's adjudication. *Id.* at 924. A rule is clearly established and not " 'new' if a state court considering a habeas petitioner's claim would have felt 'compelled by existing precedent' to conclude that the rule the petitioner seeks was required by the Constitution." [2] (citations omitted) *Id.* at 923.

The second step in the analysis is to "determine whether the state court adjudication was contrary to the clearly established Supreme Court case law, either

---

1. The provisions of the amended Section 2254 apply o all habeas cases filed after the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective on April 24, 1996. *See Fugate v. Turpin*, 8 F.Supp.2d 1383 (M.D.Ga.1998).

2. *See Teague v. Lane*, 489 U.S. 288, 316, note 32, 109 S.Ct. 1060, 1078, 103 L.Ed.2d 334 (1989).

because the state court failed to apply the proper Supreme Court precedent, or because the state court reached a different conclusion on substantially similar facts." *Id.* Third, "If the state court's decision is not contrary to law, the reviewing court must then determine whether the state court unreasonably applied the relevant Supreme Court authority." *Id.* If the state court decision was not contrary to clearly established Supreme Court law, or was based on an unreasonable application of the law or an unreasonable determination of the facts, the state court decision must stand. *Id.*

■ In reviewing Petitioner's request for habeas relief, the Court is required to apply a presumption of correctness to determinations of factual issues made by the state court. 28 U.S.C. § 2254(e)(1). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact. *McBride v. Sharpe*, 25 F.3d 962, 971 (11th Cir.1994).

■ Under the procedural default doctrine, where a state prisoner has defaulted his federal claim in state court by failing to present such claim at trial, on direct appeal or in the state habeas proceeding, federal habeas review of the claim is barred if pursuant to an independent and adequate state procedural rule. However, a procedural default is excused if the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). Because a procedural default may be excused if it results from constitutionally ineffective assistance of counsel, the Court will first consider Petitioner's ineffective assistance of counsel claims. *See Murray v. Carrier*, 477 U.S.

478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986).

### B. Sixth Amendment—Ineffective Assistance of Counsel Claims

Petitioner argues federal habeas relief on his claims is not precluded because he has a valid ineffective assistance of counsel claim which constitutes sufficient cause to excuse any possible procedural default.

Petitioner contends he was denied the right to effective assistance of counsel. Counsel repeatedly admitted that Petitioner was guilty of murder although Petitioner had entered a plea of not guilty. Petitioner contends this admission resulted in prejudice to Petitioner. Petitioner also contends his counsel failed to investigate the facts and develop or present competent expert testimony on Defendant's mental state; counsel improperly injected the issue of parole into the sentencing phase of the jury's deliberations; counsel failed to obtain an expert pathologist; counsel failed to object to erroneous and misleading jury instructions given during the sentencing phase; counsel failed to object to instructions defining kidnapping with bodily injury; and counsel failed to object to the prosecutor's improper arguments made during closings. Petitioner also contends counsel was ineffective as a result of his failure to call Petitioner as a witness.

To succeed on an ineffective assistance of counsel claim, the petitioner must first show that counsel's performance was deficient. *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir.1998) (quoting *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The defendant must also show that the deficient performance prejudiced the defense to the extent that the defendant was deprived of a fair trial. *Id.* Counsel's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2065. The defendant must show counsel's representation fell be-

low an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. The defendant may demonstrate prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, [i.e.] a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. Specifically, "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [3] *Id.* at 694, 104 S.Ct. 2052.

Petitioner was first represented by Kenneth Krontz who was present with Petitioner at the June 13, 1984 hearing on the issue of appointment of counsel. Krontz was appointed as temporary counsel. On June 14, 1984, Alden Snead was appointed as permanent counsel. Subsequently, Krontz and his associate, Jennifer McLeod were appointed to assist Snead.[4] Snead represented Petitioner at the June 26, 1984 preliminary hearing. Petitioner was indicted on July 17, 1984. The first Unified Appeal Procedure was held on September 20, 1984. A *Jackson–Denno* hearing was held October 18–19, 1984.

### 1. Admission of guilt

Petitioner argues trial counsel admitted to the jury during opening and closing arguments that Petitioner was in fact guilty of murder as charged in the indictment.[5] The state habeas court concluded that counsel's performance in this regard

was not professionally unreasonable. (Respondent's Ex. 2E, p.2065).

■ Petitioner contends the state court's findings on the ineffective assistance of counsel claims involve mixed questions of law and fact and are not entitled to the presumption of correctness provided under 28 U.S.C. § 2254(e)(1).[6] Petitioner's assertion is not entirely correct. When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Collier v. Turpin,* 177 F.3d 1184, 1197 (11th Cir.1999), *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

Petitioner argues that under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) counsel's performance was deficient. In *Cronic,* the United States Supreme Court stated in a footnote, "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." 466 U.S. at 656, n. 19, 104 S.Ct. at 2045. This statement does not prohibit counsel from admitting on behalf of the defendant to any facts charged in the indictment. The statement which immediately precedes the aforementioned comment is equally as important. As in the case at bar, the Supreme Court stated, "If there is no bona

---

**3.** The prejudice prong of the *Strickland* test does not require analysis from a contemporary vantage point. *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

**4.** Hereinafter, the Court will refer to Petitioners three attorneys collectively as "counsel."

**5.** Petitioner's counsel stated in opening argument that the death of Christie Griffith, "was caused, in fact, by Mr. Parker." (Respondent's Exhibit No. 1H—Trial Transcript, p. 615). In closing argument, Petitioner's counsel stated with regard to the charge of murder, "We admitted, more or less admitted in our opening statement that we did, in fact,

cause the death of Christie Griffith." (*Id.* at 888). Again with respect to Count One for murder, counsel stated, "having admitted more or less Court 1, I must discuss with you Count 2." (*Id.* at 891). Counsel also stated in closing argument, "[W]e feel that you will find us guilty of murder." (*Id.* at 899).

**6.** The presumption of correctness "arises when: (a) a hearing on the merits of a factual issue; (b) is made by a state court of competent jurisdiction; (c) in a proceeding to which the applicant and the state were parties, and (d) is evidenced by a written finding, opinion, or other reliable and adequate written indicia." *Mills v. Singletary,* 63 F.3d 999, 1022, n. 37 (11th Cir.1995).

fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Id.* Petitioner must concede that it is difficult to find a balance between maintaining the adversarial process and admitting any fact which provides an element of the offense charged. The Court finds it equally as difficult to determine what other course of action counsel could have taken in light of the trial court's admission of Petitioner's inculpatory statements.

Petitioner argues counsel did more than admit to facts but also unequivocally admitted "legal guilt." Counsel did not unequivocally admit Petitioner's legal guilt. Furthermore, there is no per se rule prohibiting counsel from admitting to facts related to one or all of the crimes charged in spite of entering a plea of not guilty. Counsel's statements made in argument do not amount to a stipulation of guilt or the entry of a guilty plea. *Compare, Palfy v. Cardwell,* 448 F.2d 328 (6th Cir.1971) (where counsel stipulated to certain facts damaging to defendant, court held trial proceedings were not a farce and mockery of justice which would demonstrate the defendant was denied effective assistance of counsel).

The Court must reconcile *Strickland* and *Cronic.* The Court in *Cronic* used a strict standard to determine whether counsel's overall performance resulted in a denial of the defendant's Sixth Amendment right to counsel. The Tenth Circuit Court of Appeals held counsel was ineffective based on the circumstances surrounding counsel's appointment and counsel's background. In that case, the trial court appointed a young real estate lawyer to represent the defendant in a mail fraud trial. Counsel was given only 25 days to prepare for trial although the Government had investigated the case for over four years and had reviewed thousands of documents prior to trial. The Tenth Circuit merely inferred that counsel's performance was deficient without identifying any particular errors; however, the United States Supreme Court reversed and remanded holding that the factors noted by the Court of

Appeals in determining that counsel was presumptively deficient did not provide a basis for concluding that the defendant had been denied effective assistance of counsel. The Tenth Circuit's criteria did "not demonstrate that counsel failed to function in any meaningful sense as the Government's adversary." *Cronic,* 466 U.S. at 667, 104 S.Ct. at 2051. Furthermore, the Supreme Court limited the applicability of *Cronic* to cases where the habeas petitioner challenges the overall performance of counsel as opposed to cases governed by *Strickland* in which the petitioner "pursue[s] claims based on specified errors made by counsel." *Cronic,* 466 U.S. at 667, n. 41, 104 S.Ct. at 2051, n. 41; *see also Perry v. Leeke,* 488 U.S. 272, 280, 109 S.Ct. 594, 600, 102 L.Ed.2d 624 (1989) ("actual or constructive denial of the assistance of counsel altogether is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." (citations omitted)).

Since the decision in *Cronic,* the Eleventh Circuit has limited its applicability to cases in which "circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Vines v. U.S.,* 28 F.3d 1123, 1128 n. 8 (11th Cir. 1994) (quoting *Chadwick v. Green,* 740 F.2d 897, 901 (11th Cir.1984).) Essentially, *Cronic* identifies three exceptions to *Strickland* in which the presumption of ineffectiveness may arise: (1) when counsel is completely denied, (2) when counsel is denied at a critical stage of trial, and (3) when counsel fails to subject the prosecution's case to meaningful adversarial testing. *Id.* at 1127. Furthermore, the analysis of an ineffective assistance of counsel claim comes with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at

2065 (internal quotations and citations omitted). Consequently, *Cronic* does not support the conclusion that the error identified by Petitioner was so egregious that the defendant was denied any meaningful assistance or that counsel's overall performance rendered the adversarial process totally meaningless.[7] *Cronic* does not demonstrate that counsel's admission constitutes a deficient performance.

■ The record clearly establishes that counsel admitted to causing the death of the victim in order to maintain credibility with the jury for the purpose of avoiding the death sentence. Employing such a legal tactic does not constitute representation which falls below an objective standard of reasonableness. Petitioner also contends *Francis v. Spraggins*, 720 F.2d 1190, 1194 (11th Cir.1983), supports his claim. In *Francis*, the Eleventh Circuit held, "Where a capital defendant, by his testimony as well as his plea, seeks a verdict of not guilty, counsel though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury." As the state habeas court pointed out, *Francis*, also a capital case, is distinguishable from Petitioner's case. *Francis* did not involve the admission of a confession. Also, in *Francis* the defendant took the stand and denied any knowledge of participating in the crimes; in this case Petitioner did not take the stand. Furthermore, the Court in *Francis* pointed out that counsel went as far as to express his personal opinion that the defendant was guilty.

The confines of *Francis* are further delineated by *Lobosco v. Thomas*, 928 F.2d 1054 (11th Cir.1991). In *Lobosco*, the defendant was arrested for murder and armed robbery and gave a confession which was not challenged on admissibility grounds. The defendant received two life sentences. In his habeas petition before the district court, the defendant argued the prosecution's case was not subjected to meaningful adversarial testing because defense counsel used the guilt/innocence phase to show defendant's remorse. Closing arguments were not recorded and defense counsel contended his admission was made with the defendant's consent although defendant's consent was not made a part of the record. However, because the habeas record clearly demonstrated, through counsel's testimony, that the defendant consented to counsel's tactic and the defendant had confessed to the crime, the Eleventh Circuit affirmed the district court's denial of relief. Similarly, there is no evidence Petitioner had any objections to counsel's tactics here[8] and there was a confession by Petitioner. In the case at bar, defense counsel's performance was not professionally unreasonable.[9]

---

7. *Compare United States v. Swanson*, 943 F.2d 1070 (9th Cir.1991) ("When a defense attorney concedes that there is no reasonable doubt concerning the only factual issues in dispute, the Government has not been held to its burden of persuading the jury that the defendant is guilty.") (applying *Cronic*).

8. Mr. Snead argued on behalf of Petitioner during closing arguments and Mr. Snead unequivocally stated at the state habeas hearing that he discussed the strategy to be used in argument with Petitioner. (Respondent's Ex. No. 2G, p. 34). Petitioner was also asked several times whether he was satisfied with the advice of counsel, and he never raised any objections. (*Id.* at 65; Respondent's Ex. No. 1I, p. 920). The Court is not persuaded by Petitioner's Affidavit in which he states that he was not informed by defense counsel of the plan to admit his guilt. While Petitioner states that he never agreed or consented to allowing defense counsel to admit his guilt, noticeably absent from his affidavit is any testimony that Petitioner would have preferred counsel not make an admission.

9. Petitioner also contends counsel's performance was deficient under *Young v. Zant*, 677 F.2d 792 (11th Cir.1982). In *Young* the petitioner was convicted of malice murder, armed robbery and robbery by intimidation. The jury recommended that the petitioner be put to death and he was sentenced accordingly. In *Young* counsel did not merely concede the petitioner's guilt but failed to adopt obvious defenses and failed to request a jury instruction on a lesser included offense all because of counsel's lack of preparation regarding the petitioner's factual claims and counsel's fail-

With regard to the prejudice prong, Petitioner argues counsel's admission was inherently prejudicial. The Court is not persuaded by cases cited by Petitioner that have held defense counsel's concession of a defendant's guilt creates a presumption of prejudice which amounts to per se ineffective assistance under the standard espoused in *Cronic*. Petitioner cites the Eleventh Circuit case of *Magill v. Dugger*, 824 F.2d 879, 887–89 (11th Cir.1987). The Court in *Magill* did not hold that an admission of guilt during the guilt phase is inherently prejudicial or results in per se ineffectiveness. In *Magill*, the defendant was arrested and confessed to murder. The defendant entered a plea of not guilty to the charges of armed robbery, involuntary sexual battery, and first degree murder. At trial, the defendant took the stand and again confessed to killing the victim. On cross-examination the defendant admitted that the crime was committed with aforethought. Consequently, the jury found the defendant guilty of premeditated murder. The jury also sentenced the defendant to death. The defendant's attorney in *Magill* decided on the first day of trial to act as lead counsel although he had not prepared himself adequately. The record in *Magill* clearly established that counsel admitted the defendant's guilt with respect to killing the victim; however, the Court identified defense counsel's error as the failure to explain that although the defendant had killed the victim he lacked the premeditation required to convict for first degree murder. The Court focused on counsel's "lack of clarity regarding the defense theory" rather than establishing a bright-line rule that an admission of guilt amounts to per se ineffectiveness and inherent prejudice. In light of the overwhelming evidence against Petitioner including his confession, Petitioner cannot

show that there is a reasonable probability that, but for counsel's admission, the outcome of the proceeding would have been different.

Petitioner contends counsel's admission prejudiced Petitioner during the guilt/innocence phase by making it impossible for the jury to return any verdict on the murder charge other than guilty. Petitioner argues the jury could have returned a verdict of guilty but mentally ill but for the admission by counsel and the absence of evidence that Petitioner's mental state fell within statutory requirements. Petitioner must concede that, rather than the admission, it was the lack of evidence which made a verdict of guilty but mentally ill impossible.

Petitioner also contends the admission undermined the mitigating circumstances counsel sought to prove. Again, Petitioner relies on *Magill*. In that case, the court identified the defendant's testimony during the guilt phase as causing a "devastating blow to the persuasiveness of the mitigating factors." *Magill*, 824 F.2d at 889. In that case, the defendant admitted twice on the stand that the murder was planned. Here, there is no such evidence which could have, even in culmination, affected the outcome of the penalty phase. Petitioner failed to make a showing of prejudice during the guilt/innocence phase or during the sentencing phase. Consequently, Petitioner was not deprived of a fair trial or the counsel guaranteed by the Sixth Amendment.

### 2. Expert pathologist [10]

█ Petitioner argues he received ineffective assistance of counsel when his trial attorneys failed to consult with him or obtain the testimony of an expert patholo-

---

ure to understand the basic trial procedures. 677 F.2d at. 799. Here, there was no misunderstanding regarding Petitioner's factual claims or the trial procedure. Additionally, there is no evidence of a lack preparation. Therefore, counsel's representation did not fall below an objective standard of reasonableness.

**10.** Petitioner is correct in his assertion that this claim was fairly presented and fully briefed in the state habeas proceedings. (Respondent's Ex. No. 2A, p. 377; Respondent's Ex. No. 2D, p. 1384).

gist to rebut the State's expert testimony concerning the rape charge.[11] Defense counsel Snead filed a motion to employ additional experts early on the case. However, counsel later withdrew this motion and instead requested the appointment of additional counsel to assist in Petitioner's defense. Petitioner argues the testimony of an independent pathologist was crucial at trial because Warren Tillman, a criminalist[12] and witness for the State, testified there was a "probability" that rape occurred. (Respondent's Exhibit No. 1I, p. 807).

At the state habeas hearing, Snead testified that he did not see a need to obtain an expert pathologist because when counsel interviewed Tillman, Tillman indicated that he could not state that a rape had "definitely" occurred. (Respondent's Exhibit 2G, p. 30). Also, Petitioner had made statements that a rape did occur and statements that a rape did not occur. In contrast, at the state habeas hearing Petitioner proffered evidence from an expert pathologist, Joseph Burton, which indicated there was no reliable physical evidence of a rape. Burton also testified that at the time of Petitioner's trial there were at least five or six qualified pathologists, including himself, who were available to testify. With respect to this claim, the state habeas court found no attorney error and no prejudice to the defense. The state court concluded that because Petitioner's rape conviction was overturned, Petitioner could not have possibly been prejudiced by counsel's failure to present rebuttal testimony from a pathologist.

Petitioner correctly asserts that under *Strickland* "counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066. *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987), *withdrawn in part on other grounds,* 833 F.2d 250 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988), is the controlling case on this issue. The petitioner in *Elledge* was charged with murder. After the insanity defense could not be supported and the petitioner's confession was not suppressed, the petitioner entered a plea of guilty and the jury determined his sentence. In *Elledge* the petitioner contended that with respect to the sentencing phase counsel made no effort to locate an expert psychiatric witness or to put on background character testimony from family members in mitigation. Defense counsel in *Elledge* believed the petitioner was "crazy" and discovered that the petitioner was taking medication for psychiatric and physiological disorders. However, defense counsel proffered only the petitioner's testimony during the sentencing phase. The Eleventh Circuit agreed with the district court's conclusion that counsel's failure to at least question the petitioner's relatives and to seek an expert witness was outside the range of competent assistance. "[C]ounsel's total failure to investigate possible witnesses, both expert and lay, when he was aware of [the petitioner's] past and knew that mitigation was his client's sole defense, was unprofessional performance."[13] *Elledge,* 823 F.2d at 1445. Consequently, the test announced in *Elledge* for evaluating the first prong of *Strickland* is whether it is reasonably likely that a reasonable attorney,

---

**11.** Respondent argues Petitioner has never raised a claim regarding defense counsel's failure to consult with an expert pathologist before deciding not to request an independent pathologist. However, this claim was raised and briefed in the state court proceedings. (Respondent's Ex. No. 2A, p. 377; Respondent's Ex. No. 2D, p. 1384).

**12.** Tillman is not a licensed physician. (Respondent's Exhibit No. 2H—Affidavit of Dr. Joseph Lawson Burton, ¶ 19).

**13.** The Court in *Elledge* also affirmed the district court's finding that counsel was aware that family members existed who could provide testimony in mitigation and that the petitioner had not dissuaded counsel from seeking out those family members who later stated to the habeas court that had they been asked to testify they would have testified. 823 F.2d at 1445, n. 11.

operating under the circumstances of the case and acting in a reasonably professional manner, would have located such a witness.

With respect to prejudice, the district court in *Elledge* found that counsel conceded that a psychiatrist could have testified during the sentencing hearing but concluded that even if such a witness had testified, the death sentence still would have been imposed. The Eleventh Circuit affirmed and held that a petitioner demonstrates prejudice from such an attorney error by showing there is "a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced." *Id.* at 1446. Under the circumstances of the case and in light of the evidence presented, the petitioner in *Elledge* failed to demonstrate prejudice.[14] In summary, with respect to both prongs of *Strickland*, the Eleventh Circuit held a habeas petitioner must show

> (a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed.

*Id.* at 1446, n. 15. *See also Daugherty v. Dugger*, 839 F.2d 1426, 1432 (11th Cir. 1988) (court found no prejudice because severity of aggravating circumstances outweighed effect of proposed psychiatric testimony in light of conflicting evidence

regarding mitigating circumstances); *Horsley v. State of Alabama*, 45 F.3d 1486, 1495, n. 20 (11th Cir.1995), *cert. denied*, 516 U.S. 960, 116 S.Ct. 410, 133 L.Ed.2d 328 (1995) (where court noted that petitioner could not establish a reasonable probability that having heard the proposed expert testimony "the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (citations omitted)).

In the case at bar, it was not professionally unreasonable for counsel not to investigate the possibility of rebuttal testimony from an expert pathologist. As Petitioner contends, counsel acknowledged that the rape charge was crucial to Petitioner's avoiding the death sentence. And in opening statement, counsel informed the jury that no evidence of rape would be presented. However, Tillman testified that there was a probability that rape had occurred and Tillman made similar statements in counsel's interview prior to trial.

In the state habeas proceeding, Petitioner submitted expert testimony which would indicate such a failure to investigate was professionally unreasonable. *See* Respondent's Ex. No. 2H, Affidavit of Peter Tague, ¶¶ 14 and 15. Petitioner further provided evidence of what kind and how much investigation an ordinary, reasonable lawyer would have undertaken. *Id.* The Burton Affidavit demonstrates that it was reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced. Dr. Burton himself indicated that due to his geographic proximity he would have been available to testify and so would several other physicians or pathologists.

---

**14.** To demonstrate prejudice, such a petitioner

> could present testimony from (a) members of the bar relating to the amount of investigation that is reasonable in such a situation and the ease or difficulty in finding such experts at that time, (b) psychiatrists, or other experts in the field, relating to how widely the proposed theory was accepted at

> the time the investigation occurred and the ease an attorney would have had in getting such experts, and (c) any other relevant testimony that would tend to demonstrate it was reasonably probable that reasonable diligence would uncover an expert similar to the one eventually located.

> *Elledge*, 823 F.2d at 1447, n. 17.

Although Tillman's testimony could have been rebutted, counsel did effectively cross-examine Tillman with regard to his conclusion that a rape had probably occurred. Counsel made Tillman concede that maggot activity in the vaginal area did not prove rape "one way or another." (Respondent's Ex. No. 1I–p. 819). *Compare Card v. Dugger,* 911 F.2d 1494 (11th Cir.1990) (failure to present independent expert testimony not unreasonable performance by counsel where counsel effectively cross-examined state's expert witness); *Riley v. Wainwright,* 778 F.2d 1544 (11th Cir.1985) (where defense counsel was able to elicit testimony from the state's medical expert regarding points favorable to the defense, counsel's decision not to present additional testimony from an independent expert was not outside the range of professional competence). As Respondent contends, Petitioner failed to demonstrate a reasonable probability that the suggested testimony would have affected the verdict. Petitioner also failed to demonstrate the existence of a reasonable probability that the suggested testimony would have affected the sentence imposed.

The affidavits of members of the jury cannot be considered by this court as they were similarly not considered by the state habeas court. Under Federal Rule of Evidence 606(b),

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith[.] Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

*See also United States v. Ayarza–Garcia,* 819 F.2d 1043, 1051 (11th Cir.1987), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987) ("[I]nquiries that seek to probe the mental processes of jurors are impermissible."); *compare,* O.C.G.A. § 17–9–41 (1997); *Spencer v. State,* 260 Ga. 640, 643, 398 S.E.2d 179, 184 (1990), *cert. denied,* 500 U.S. 960, 111 S.Ct. 2276, 114 L.Ed.2d 727 (1991) (general rule that affidavits of jurors may not be taken to impeach their verdict does not apply when "extrajudicial and prejudicial information has been brought to the jury's attention improperly or where non-jurors have interfered with the jury's deliberations.").[15] Petitioner failed to demonstrate that the mere introduction of rebuttal testimony on the evidence of rape would have created the probability of a different verdict on the rape charge, especially in light of the Petitioner's statement that he had indeed raped the victim. Even in the absence of the rape conviction, Petitioner would have been sentenced to death. The jury found three individual aggravating circumstances, two of which survived appeal.[16] Under Georgia law one aggravating circumstance is sufficient for a recommendation of death. *See* O.C.G.A. § 17–10–31 (1997). Consequently, because of Petitioner's failure to show prejudice at either stage of the trial, Petitioner is not entitled to relief.

### 3. Expert Psychiatric or Psychological Testimony

Petitioner contends he received ineffective assistance of counsel when his trial counsel failed to obtain or present competent expert psychiatric or psychological testimony. The state habeas court concluded there was no error in counsel's failure to secure an additional independent mental health expert because "there was no compelling evidence of mental instabili-

---

**15.** The exception for juror misconduct found in *Tanner v. U.S.,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), does not apply to Petitioner's claim.

**16.** Although Petitioner challenges counsel's performance in connection with the aggravating circumstance which survived appellate review, the Court, as indicated below, also finds that claim to be without merit.

ty to require petitioner to investigate." Respondent's Ex. 2E No., p.2084.

■ Petitioner first asserts that counsel failed to use reasonable diligence in pursuing the motion for an award of funds for the retention of a psychiatric expert and neglected to object to the "meager" award of $300.00 until after trial.[17] With respect to this claim, the state habeas court declined to relitigate the issue. Under *Ake v. Oklahoma*, 470 U.S. 68, 74, 105 S.Ct. 1087, 1091–1092, 84 L.Ed.2d 53 (1985), "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on the issue if the defendant cannot otherwise afford one."[18] The defendant must have "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83, 105 S.Ct. at 1096.

■ There is no per se rule regarding the time at which defense counsel should seek psychiatric assistance or a rule regarding the amount of funds necessary for an adequate award. Petitioner contends counsel failed to promptly identify an expert, failed to determine the amount of funds necessary to retain the services of an expert, and failed to object to the award made by the trial court. Petitioner argues the facts surrounding the killing should have put counsel on notice to promptly evaluate Petitioner's mental condition. However, the facts surrounding the killing, although they may suggest aberrant behavior, fall short of demanding the conclusion that Petitioner operated under a delusional compulsion or was otherwise insane. The Court cannot accept the generalization made by Petitioner that any crime involving similar facts and circumstances is necessarily committed by a person who is insane. *See Ake*, 470 U.S. at 90, 105 S.Ct. at 1100 (Rehnquist, J., dissenting).

The state habeas record also does not support the conclusion that the $300 award by the trial court was "patently inadequate" or that Petitioner's counsel should have objected to its alleged inadequacy. Petitioner's expert testimony regarding the inadequacy of the fee is deficient. While there is evidence of the cost of an allegedly more "thorough" evaluation, there is no evidence of the cost typically charged for the evaluation of an indigent defendant in such a case or the availability of such an expert. Neither the attorney expert, Peter W. Tague, nor the psychiatric experts, Dr. Ellen Garb McDaniel and Dr. Joanne Yanowitz Max, proffered such testimony. Consequently, Petitioner's counsel did not err in failing to object to the $300 award, and there was no prejudice.

Petitioner compares the case at bar to *Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992). In that case the petitioner was convicted of murder and sentenced to death. In the federal habeas action, the petitioner contended counsel was ineffective in the penalty phase by failing to pursue an independent psychological analysis. Counsel did not present any psychiatric evidence at sentencing. On appeal, the Fifth Circuit held, "The state court's factual findings make clear that the decision of defense counsel not to pursue an independent psychological analysis of [the defendant] was neither a strategic choice made after investigation nor a strategic choice made in light of limits on investigation." *Loyd*, 977 F.2d at 158. The court concluded counsel wrongly assumed funds

---

**17.** This claim was raised in Petitioner's Amended Application for Writ of Habeas Corpus and argued in Petitioner's State Post–Hearing Brief. (Respondent's Ex. No. 2A, p. 381; Respondent's Ex. No. 2D, p. 1405).

**18.** The Court in *Ake* stated further, "When the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent. It is in such cases that a defense may be devastated by the absence of a psychiatric examination and testimony." 470 U.S. at 82–83, 105 S.Ct. at 1096.

were not available and abandoned a valid and important mitigating circumstance; counsel was also unaware of the law and had not made a thorough investigation of the law to make a strategic decision not to provide psychiatric testimony at the sentencing phase. The Court is not persuaded by *Loyd* because the facts of the case at bar are in no way similar to the facts of *Loyd*. In the case sub judice, Petitioner's trial counsel obtained funds for Petitioner's mental evaluation, counsel retained an independent expert, and the expert testified during the sentencing phase of Petitioner's trial.

■ Petitioner argues counsel was ineffective by failing to present any psychiatric evidence during the guilt/innocence phase.[19] The state habeas court concluded that because there was no compelling evidence of mental instability, Petitioner's counsel was not ineffective in failing to present psychiatric evidence during the guilt/innocence phase. The state habeas court relied on *Bertolotti v. Dugger*, 883 F.2d 1503 (11th Cir.1989). In that case, the Eleventh Circuit concluded that counsel's performance did not fall below the standard of reasonableness because counsel made inquiries concerning the defendant's mental state and competence to stand trial, and there was evidence that the defendant appreciated the wrongful-

ness of his conduct. *Bertolotti*, 883 F.2d at 1515.

Petitioner argues during voir dire and opening arguments defense counsel planted the seed that Petitioner was mentally ill but never followed up by presenting evidence of mental illness; consequently, the trial court could not give jury instructions authorizing a finding of a guilty but mentally ill.[20] Although counsel did make statements regarding Petitioner's mental condition during opening statements, during voir dire counsel indicated that such evidence would be proffered during the sentencing phase and counsel's questions to the panel regarding mental illness were pertinent only to sentencing. (Petitioner's Opening Brief, p. 177, n. 116). However, in light of counsel's admission, mental illness appears to have been Petitioner's only defense. Therefore, it may have been professionally unreasonable for counsel not to present any expert testimony on Petitioner's mental state during the guilt/innocence phase.[21]

Although defense counsel may have committed error, there is no evidence in the record that counsel could have obtained favorable expert testimony for trial. There is no evidence that through reasonable diligence counsel could have obtained an expert to testify favorably on the mental illness defense; therefore, Petitioner

---

19. Respondent contends Petitioner did not raise this precise argument in the state habeas petition. However, as noted by Petitioner, in the original and amended state habeas petition Petitioner asserted that counsel was ineffective by failing to obtain and present competent psychiatric testimony in the both the guilt and sentencing phases of trial (Respondent's Ex. No. 2, Application for Writ of Habeas Corpus, ¶ 57; Respondent's Ex. No. 2A, Amended Application for Writ of Habeas Corpus, ¶ 90). Petitioner explained that although his mental state was a critical issue in the case, counsel failed to present psychiatric evidence during the guilt phase. (Respondent's Ex. No. 2D, p. 1401). Therefore, this claim has been exhausted and is not procedurally defaulted.

20. Under *Brown v. State*, 228 Ga. 215, 217, 184 S.E.2d 655, 657 (1971), the trial court

may instruct the jury as follows when there is presented evidence of mental disease including expert testimony on the issue: "The act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a disease[d] mind." *See also Duck v. State*, 250 Ga. 592, 300 S.E.2d 121 (1983); *Johnston v. State*, 232 Ga. 268, 206 S.E.2d 468 (1974).

21. At the state habeas hearing, defense counsel testified that he felt certain that if they had a complete examination of Petitioner it would have been harmful to the defense's position at trial. Also, counsel testified that the fact that Petitioner was not examined until shortly before trial and that counsel did not receive a written report of the examination results until shortly before the end of the culpability phase was also a strategic decision to avoid or prolong counsel's obligation to turn over the results to the prosecution.

was not prejudiced by any alleged error of counsel in failing to present psychiatric evidence during the culpability stage.

Petitioner also contends counsel was defective in retaining Dr. Herbert Eber for expert psychiatric testimony and permitting Dr. Eber to provide testimony harmful to Petitioner's efforts to avoid the death penalty. First, Petitioner argues Dr. Eber's examination of Petitioner was inadequate and unprofessional. Dr. Eber failed to personally examine Petitioner and merely ordered his assistant to administer a multiple-choice examination which produced computer-generated results. Petitioner's assertion that Dr. Eber's method of evaluation was not thorough is supported by the Affidavit of Dr. McDaniel. Petitioner also contends competent counsel would not have permitted Dr. Eber to make the following statements on the stand: (1) that Petitioner was only "marginally crazy," (2) that he was "more likely to lose control," (3) that he is not a "person who should have been committed to the hospital" and (4) that Petitioner was "likely to do something that is pretty nasty."

Tague, Petitioner's attorney expert, testified that counsel was defective in not securing an expert to determine whether further inquiry into Petitioner's mental status was warranted and counsel was defective in permitting Dr. Eber to give harmful testimony. Tague also testified

that the conclusions drawn by Dr. McDaniel, if provided at sentencing, would have caused the jury to have been more likely to sentence Petitioner to life. However, the Tague affidavit is deficient in that he failed to testify as to defense counsel's ability to retain an expert such as Dr. McDaniel. Even if counsel had retained such an expert to give similar testimony, the testimony would not have affected Petitioner's sentence; a verdict of guilty but mentally ill would not have saved Petitioner from the death penalty. *See Logan v. State,* 256 Ga. 664, 665, 352 S.E.2d 567, 568 (1987). Consequently, Petitioner failed to demonstrate that he was prejudiced by counsel's selection of experts.[22] *Compare Elledge,* 823 F.2d at 1446 (petitioner made no showing that it was reasonably probable that an ordinary, reasonable lawyer, operating under the time and monetary constraints of which petitioner's counsel faced and using reasonable diligence, would have discovered a psychiatrist who would have testified as did the expert proffered at the state habeas proceeding).

Petitioner also argues if the jury were informed of Petitioner's mental state it would have sentenced him to life rather than death. However, the State's psychiatric expert testified, as did Dr. McDaniel, that Petitioner had an alcohol abuse problem and a narcissistic personality disorder. (Respondent's Ex. No. 1J, p. 1098). The

**22.** Petitioner contends Dr. McDaniel's affidavit indicates that defense counsel could have obtained experts to testify at trial who would have given the same kind of testimony that she provided in the state habeas proceeding. However, the McDaniel Affidavit does not so state. Dr. McDaniel stated, "If Mr. Parker's counsel had hired a competent psychiatric expert, an adequate evaluation of Mr. Parker could have been obtained." (Respondent's Ex. 2H, McDaniel Affidavit, ¶ 31). This is not evidence of the availability of such an expert at that time. Similarly, the Affidavit of Dr. Joanne Max, a clinical psychologist, does not contain any statements demonstrating the availability of such an expert witness. Petitioner repeatedly argues that Dr. Eber's testimony was harmful to the defense at sentencing and urges this Court to conclude that the testimony was so harmful that it was inher-

ently prejudicial. *See Rickman v. Bell,* 131 F.3d 1150, 1159 (6th Cir.1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 1827, 140 L.Ed.2d 962 (1998) (most damaging images of the defendant were presented by defense counsel and found by court to be inherently prejudicial). However, the testimony of Dr. Eber was not unbalanced or directly harmful to Petitioner. Furthermore, to demonstrate prejudice, Petitioner must not only show that Dr. Eber's testimony was harmful but also show that there existed a reasonable probability that counsel could have identified and retained an expert to provide beneficial testimony and there existed a reasonable probability that such testimony would have changed the outcome at sentencing. The McDaniel Affidavit and Max Affidavit could be considered more harmful than Dr. Eber's testimony.

trial court charged the jury to consider mitigating circumstances not identified by the court but introduced as evidence on the defendant's behalf. This Court must presume that the jury followed the law as instructed, and in spite of Petitioner's mental condition found him guilty of murder and sentenced him to death. Additionally, the jury was instructed and authorized under the law to recommend a life sentence even if it found no mitigating circumstances. Moreover, for the same reasons stated above, Petitioner cannot show that he was prejudiced by the failure to present more favorable testimony at that time.

### 4. Injection of issue of parole during sentencing

 Petitioner contends counsel was ineffective by knowingly injecting into the jury's sentencing deliberations the issue of Petitioner's possible eligibility for parole if given a life sentence rather than the death penalty. Petitioner also contends counsel was ineffective by failing to correct misleading statements concerning Georgia's parole eligibility rules. The following colloquy between defense counsel and Dr. Eber took place during the sentencing phase:

Snead: Should he be placed in the Georgia prison systems and you'll test him again, and same results you have will be placed in his records, is that correct?

Eber: That's very much so. There's usually very little change. There will probably be less anxiety so the report will be less concerned about that.

Snead: And it's your opinion that he will not be out on parole for 40 years; is that correct?

Eber: That's essentially correct.

Snead: And you are familiar with the Parole Board's classification and parole policies; are you not?

Eber: Yes.

Snead: And your opinion is based upon that; is it not?

Eber: Yes, sir. A person is given, I would assume, perhaps a life sentence, a

person is given a life sentence, they are eligible for parole in seven years in Georgia. But what that means is they are eligible in seven years to tell the Parole Board they would like to be able to get out. There is nothing to compel the Parole Board to tell them they may. And, in fact, the Parole Board are reasonable people and they look at the records, and what they look at is the nature of the crime, and then they try to make some judgment as to whether the person will commit another crime.

In this case, the nature of the crime is enough so that in most cases they would never turn a person loose until he's quite old, perhaps infirm. But then, also, as long as he maintains the kind of structured personality he has now that would be further reason to, not turn him loose, and the Parole Board will have copies of that. They will have copies of that.

. . . . .

So the nature of what goes to a Parole Board for decision is now very heavily emphasized as to the nature of the crime and character of the person, and so we are not seeing very early paroles of violent, serious offenses. We are seeing, as you know, very little paroles of people who have had committed what's comparatively a violent crime.

Respondent's Ex. No. 1J, pp. 1061–1063. The trial court then permitted the State, on cross-examination of Dr. Eber, to elicit testimony indicating that in some cases prisoners are released within a short period of time. The state habeas court declined to relitigate this claim because it was decided adversely to Petitioner on appeal. *See Elrod v. Ault,* 231 Ga. 750, 204 S.E.2d 176 (1974) (after an appellate review the same issues will not be reviewed on habeas corpus).

Petitioner argues the statutory ban on testimony concerning parole was violated and this violation, by itself, constitutes deficient representation under *Strickland.* Petitioner is mistaken in his assertion that a violation of state statute is per se defec-

tive representation. Under O.C.G.A. § 17–8–76(a) (1997)[23]:

No attorney at law in a criminal case shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury because pardon, parole, or clemency of any nature may be granted by the Governor, the State Board of Pardons and Paroles, or other proper authority vested with the right to grant clemency.

Although this provision may demonstrate that defense counsel did indeed violate a state statute, the Court cannot conclude that a violation of this Georgia statute constitutes a violation of any right secured by the United States Constitution. According to *Ingram v. Zant*, 26 F.3d 1047, 1052 (11th Cir.1994), *cert. denied.* 513 U.S. 1167, 115 S.Ct. 1137, 130 L.Ed.2d 1097 (1995), "[D]efendants maintain no cognizable federal right to prevent the jury, during the sentencing phase of a capital trial, from considering the possibility of parole if sentenced to life imprisonment." Therefore, violation of the above identified statute does not constitute per se attorney error and prejudice.

Respondent contends that under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 2200, 129 L.Ed.2d 133 (1994) (plurality opinion), defense counsel was entitled to present evidence on the availability of parole. In *Simmons* the Supreme Court addressed the defendant's limited right under the Due Process Clause to respond to the prosecution's evidence regarding the defendant's future dangerous-

ness. Here, the defendant/Petitioner raised the issue of parole eligibility. Consequently, the Court's analysis of the parole issue is inapplicable.

However, the Court must determine whether counsel erred in submitting evidence on the issue of parole and in failing to correct information which Petitioner contends was erroneous. The state habeas court concluded there was no attorney error because the information provided by Dr. Eber was correct. The Tague Affidavit indicates that counsel was professionally unreasonable in permitting Dr. Eber to testify about when Petitioner would be eligible for parole. On re-cross-examination, Dr. Eber conceded that Petitioner could be considered for parole in as little as seven years.[24] On the contrary, Tague's affidavit states that counsel was ineffective in failing to elicit testimony from Dr. Eber about another parole provision which prohibits consideration for parole until the expiration of at least 20 years where the defendant has been sentenced to consecutive life sentences.[25]

 While there may be some discrepancies in the effect of the parole provisions with respect to Petitioner, this Court is not required or authorized to resolve issues of state law.[26] In the case sub judice, the Court must determine whether counsel's failure to refer Dr. Eber to a statutory provision authorizing a longer period for parole consideration was, under an objective standard, professionally unreasonable. This Court concludes it was not. Dr. Eber testified as to the process for granting of

---

23. *See also* Ga.L.1955, p. 191, §§ 1–3.

24. Ga.L.1969, p. 948, § 1 (current version at O.C.G.A. § 42–9–45(b) (1997)) states, in part, "[I]nmates serving sentences aggregating 21 years or more shall become eligible for consideration for parole upon completion of the service of seven years."

25. Code 1981, enacted by Ga.L.1983, p. 523 (current version at O.C.G.A. § 42–9–30(c) (1997)) states, "When a person receives consecutive life sentences as the result of offenses occurring in the same series of acts and any one of the life sentences is imposed for the

crime of murder, such person shall serve consecutive ten-year periods for each such sentence, up to a maximum of 30 years, before being eligible for parole consideration." *See also* VIII Rules and Regulations of the State of Georgia, Ch. 475–3–.06(4)(b).

26. The Supreme Court of Georgia found no error with respect to the parole issue and under *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), whether evidence on the issue of parole should be admitted to the sentencing jury is a matter within the State's discretion.

parole. Although on re-cross-examination, Dr. Eber conceded that the Parole Board had the right to consider Petitioner for parole in as little as seven years, counsel, on re-direct, estimated Petitioner's time served prior to any possibility of parole at 40 to 50 years. Furthermore, because the Court had not yet sentenced Petitioner on the rape charge, the applicability of any such statute or regulation postponing Petitioner's parole eligibility for 20 years was uncertain.

Counsel was not ineffective by knowingly raising the issue of Petitioner's possible eligibility for parole if given a life sentence rather than the death penalty. Members of the jury, as most citizens, are well aware of the possibility of parole.[27] Petitioner urges the Court to conclude the jury's recommended sentence of death was based solely on the deterrence factor rather than retributive factors. Considering the nature of the crime, it is highly likely the jury saw fit to impose the most severe punishment regardless of the possibility or impossibility of parole. By addressing the issue directly, counsel was able to answer questions which, in all probability, inevitably arise during the jury's deliberations of a death case. Because the Court finds no attorney error, the Court will not address the issue of prejudice.

### 5. Sentencing Phase Instructions

▮ Petitioner contends he received ineffective assistance of counsel when his attorneys failed to object to erroneous and misleading jury instructions given during the sentencing phase. The trial court gave the jury the following instructions with respect to kidnapping with bodily injury:

> Now, I charge you that the statutory aggravating circumstances which you are allowed to consider in this case are that .... the murder of Christie Ann Griffith was committed while the offender was engaged in another capital felony; to wit: kidnapping with bodily injury.... [Section] 16–5–40 kidnapping with bodily injury: A person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will. It is not required that the defendant be found guilty of kidnapping before you find kidnapping as an aggravating circumstance to support the death penalty[.]

(Respondent's Ex. No. 1K, p. 1385–86). As stated above, the jury found three statutory aggravating circumstances, including kidnapping with bodily injury.[28] The state habeas court, without explanation, found this claim to be without merit.[29]

Petitioner points out that the charge above does not define or clarify the meaning of "bodily injury." Petitioner argues this error was compounded by the trial court's repeated reference to the aggravating circumstance as "kidnapping." Petitioner urges this Court to conclude that strangulation of the victim which resulted in her death could not support the "bodily injury" required for a finding of kidnapping with bodily injury because the strangulation effectively merged into the charge and conviction for murder and the jury did in fact recommend the death penalty based

---

27. Defense counsel Krontz acknowledged this fact, and the fact that, in his opinion, most jurors believe convicted murderers are released on parole in seven years. (Respondent's Ex. No. 2I, p. 48). Defense counsel Snead also testified during the habeas proceeding that the issue of parole often arises in a jury's deliberations in a death penalty case. (Respondent's Ex. No. 2G, p. 32).

28. *See* Code 1933, § 27–2534.1, enacted by Ga.L.1973, p. 159 (current version at O.C.G.A. § 17–10–30(b)(2) (1997)).

29. In one of the final paragraphs of the state habeas judgment, the court stated that Petitioners remaining ineffective assistance claims were considered and are without merit. Petitioner notes that Respondent claims this ground for relief has been procedurally defaulted; however, Respondent made no such claim in its Amended Answer and addressed the merits of this alleged instance of ineffective assistance. Furthermore, Petitioner identified this claim in his Amended Application for Writ of Habeas Corpus. (Respondent's Ex. No. 2A, p. 384).

on mere "simple" kidnapping. Petitioner contends counsel's failure to object to this instruction resulted in a violation of his due process rights and the right to a reliable jury verdict.

The Court must reject Petitioner's argument. Under the Due Process Clause of the Fourteenth Amendment, a defendant can only be convicted upon proof of every essential fact beyond a reasonable doubt. *Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985). In *Potts v. Zant*, 734 F.2d 526 (11th Cir. 1984), *vacated and remanded on other grounds*, 478 U.S. 1017, 106 S.Ct. 3328, 92 L.Ed.2d 734 (1986), the Eleventh Circuit held the failure of the trial court to instruct the jury on an element of a crime that is essential to support a death sentence for that offense deprives the defendant of due process of law. In that case, the defendant was charged with armed robbery, aggravated assault, and kidnapping with bodily injury. The trial court gave instructions on kidnapping and never used the phrase "with bodily injury" in the instruction. The jury's verdict indicated that the defendant was found guilty of only "kidnapping." With regard to aggravating circumstances, the jury identified the aggravating circumstance of kidnapping committed during the course of an armed robbery. Consequently, the Eleventh Circuit concluded the trial court's instruction at both the culpability phase and the sentencing phase deprived the defendant of due process of law.

This case is easily distinguished from *Potts*. In the case at bar, the jury did not have to render a verdict on the crime of kidnapping with bodily injury. Furthermore, the trial court identified in its instruction the aggravating circumstance of kidnapping with bodily injury. Simple kidnapping was never an issue in the case at bar.

Furthermore, the instruction given in this case is more similar to that in *Messer v. Kemp*, 760 F.2d 1080 (11th Cir.1985). In *Messer*, the defendant was charged with kidnapping with bodily injury. In describing the charges of which the defendant was accused, the trial court stated "the said accused did then and there inflict serious and grievous bodily injuries upon the said Rhonda Tanner, said injuries resulting in her death." 760 F.2d at 1092. In that case, as in the case at bar, the trial court mentioned the phrase "with bodily injury" and, arguably, noted that the bodily injury inflicted upon the victim caused her death. Without any additional description or definition, the district court found this instruction sufficient on the charge of kidnapping with bodily injury. The Eleventh Circuit affirmed. Similarly, this Court finds the charge sufficient with regard to the aggravating circumstance of kidnapping with bodily injury and the jury was not misled in any way.

In spite of Tague's testimony that reasonably competent counsel would have objected to the trial court's failure to define "bodily injury," the Court finds no attorney error. First, as stated by the Georgia Supreme Court, Petitioner's confession supports the jury's finding of kidnapping with bodily injury. The term "bodily injury" requires no definition.[30] *Green v. State*, 193 Ga.App. 894, 896, 389 S.E.2d 358, 360 (1989). Any physical injury to the victim suffices to support this aggravating circumstance. *Id.* Petitioner strangled the victim with his bare hands and then found and used an extension cord to strangle the victim until her death. Essentially, "the kidnapping with bodily injury and the [murder] occurred sequentially, and the former was completed when the latter was perpetrated." *Robinson v. State*, 210 Ga. App. 175, 176, 435 S.E.2d 466, 468 (1993).

---

**30.** The case sub judice can be distinguished from *Jones v. Kemp*, 706 F.Supp. 1534 (N.D.Ga.1989). In *Jones* the court granted habeas relief as a result of the trial court's failure to define any of the elements of the aggravating circumstance of armed robbery.

While "armed robbery" is a legal term, "bodily injury" is not. Additionally, the trial court here defined "kidnapping;" therefore, the jury was not allowed to use unguided discretion in determining whether aggravating circumstances existed.

Defense counsel's failure to object to the trial court's instruction did not deprive Petitioner of a fair sentencing hearing nor did the instruction jeopardize the reliability of the sentencing recommendation. Consequently, the Court finds this claim is without merit.

6. Sentencing instruction on unanimity

■ Petitioner argues his trial counsel also failed to object to the trial court's instruction concerning the necessity for unanimity in sentencing. Petitioner contends the error violated Petitioner's right to a fair trial and right to a reliable sentencing verdict. Although Petitioner found error in the trial court's instruction, the state habeas court concluded that it was Petitioner who had a misunderstanding of the law and found no attorney error and no prejudice.

The trial court gave the following instruction regarding unanimity of sentencing:

I charge you that it shall be your responsibility to return one of two verdicts in this phase of the trial as to Count One. It shall be either the sentence of life imprisonment, or, the death penalty. . . .

. . . . .

Now, I charge you that the verdict you return in this case must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. The verdict must be unanimous. It is your duty as a juror to consult with one another and to deliberate with the view to reach an agreement, if you can do so without surrendering honest convictions or opinions. . . . In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced that it is erroneous; but do not surrender your honest conviction as to the weight or the effect of evidence or as to what your verdict should be, solely

because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Respondent's Ex. 1K, pp. 1388–89. Petitioner correctly asserts that under O.C.G.A. § 17–10–31 (1997)[31] if the jury does not recommend a sentence of death the trial court shall sentence the defendant to imprisonment. However, Petitioner argues that the trial court stated that a verdict of death or life imprisonment must be unanimous and this incorrect statement suggested to the jury that Petitioner would be sentenced to life imprisonment only if all of the jurors agreed.

Petitioner's interpretation of the charge is far beyond what any reasonable juror would have concluded. In spite of Petitioner's affidavits to the contrary, the plain language of the charge does not suggest that Petitioner would be sentenced to life only if the jury unanimously recommended life. Taking the charge as a whole, the trial court instructed the jury on the law as provided under O.C.G.A. § 17–10–31 and stated, "When a sentence of death is not recommended by the jury, the Court shall sentence the defendant to life imprisonment." (Respondent's Ex. 1K, p. 1384). Consequently, the state habeas court, citing *Romine v. State*, 256 Ga. 521, 527, 350 S.E.2d 446, 452 (1986), concluded that the charge did not mistakenly imply that if the jury deadlocked a retrial would result.

Defense counsel's failure to object to the charge on unanimity did not violate Petitioner's due process rights or the right to a reliable sentencing. Petitioner refers the Court to *Kubat v. Thieret*, 867 F.2d 351 (7th Cir.1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). In that case, the Seventh Circuit Court of Appeals affirmed the district court's finding of attorney error with respect to the defense attorney's failure to object to the trial court's charge on unanimity. First, the respondent conceded that the charge

**31.** *See also* Code 1933, § 26–3102, enacted by Ga.L.1968, p. 1249, § 1; Ga.L.1969, p. 809, § 1; Ga.L.1973, p. 159, § 7.

was a misstatement of Illinois law. Under Illinois law, the death penalty cannot be imposed if any one juror believes that there are mitigating factors sufficient to preclude the death penalty. However, the trial court gave the following charge to the jury: "If, after your deliberations, you unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment." *Kubat*, 867 F.2d at 369. The trial court similarly provided a verdict form which stated, "We, the jury cannot unanimously conclude that the death penalty shall be imposed upon the defendant, ROBERT KUBAT. The Court shall sentence the defendant to imprisonment."

The case at bar is easily distinguished from *Kubat*. In that case, there was a clear misstatement of law. Here, the trial court did not err in charging the jury on unanimity. The trial court did not call for a unanimous agreement on a decision not to impose the death penalty, but called for a unanimous agreement on the decision to impose life or the decision to impose death.

The case at bar is more similar to *United States v. Chandler*, 996 F.2d 1073 (11th Cir.1993). *Chandler* involved a federal statute regarding capital sentencing, 21 U.S.C. § 848(k) and (*l*) (Supp.1982–1998). Under this Code section, where the jury cannot unanimously recommend a death sentence, the district court must sentence the defendant to some lesser form of punishment.[32] The trial court instructed the jury that "a verdict recommending a sentence of death must be unanimous[,]" and "If you do not make such a recommendation, the court is required by law to impose a sentence other than death." The petitioner in *Chandler* argued, as Petitioner here, the jury should be instructed that the failure to reach unanimity would result in his receiving a sentence other than

death to be determined by the court. The Eleventh Circuit rejected the petitioner's argument and concluded that the district court was not required to instruct the jury on the consequence of the jury's inability to reach a unanimous verdict. *Chandler*, 996 F.2d at 1089. The Eleventh Circuit also acknowledged and validated the important interest the criminal justice system has in unanimous verdicts. *Id.* The trial court in *Chandler* and the trial court here both encouraged the jurors to reexamine their opinions and advised them to not be swayed by pressure from other jurors and stick to their honest beliefs. Therefore, Petitioner was not deprived of a fair trial or reliable sentencing and there was no attorney error in the failure to object. *Compare, Jones v. United States*, —— U.S. ——, 119 S.Ct. 2090, —— L.Ed.2d —— (1999) (Eighth Amendment prohibition of cruel and unusual punishment does not require that jurors in federal death penalty case be instructed on consequence of their failure to agree on whether defendant should be sentenced to death or life imprisonment without possibility of release); *Coe v. Bell*, 161 F.3d 320, 339 (6th Cir.1998) (district court's ruling that trial court's instruction to jury for both the death and life verdict to be unanimous was error reversed; instruction did not "unconstitutionally deceive the jury" or "infect the verdict ... with unreliability"); *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3rd Cir.1991), *cert. denied*, 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991) (any possible failure to instruct the jury on the result of the failure to reach unanimity did not raise an error of constitutional dimension); *Skaggs v. Parker*, 27 F.Supp.2d 952 (W.D.Ky.1998) (absence of instruction of sentence of less than death when jury fails to unanimously agree on death does not constitute a due process violation); *Barfield v. Harris*, 540 F.Supp. 451 (E.D.N.C. 1982) (failure to charge on the result of a

---

**32.** 21 U.S.C. § 848(k) provides, in part, "A finding with respect to any aggravating factor must be unanimous." 21 U.S.C. § 848(*l*) provides, in part, "Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law."

lack of unanimity was not substantially inaccurate and did not pose a significant risk of arbitrariness into the sentencing hearing).

### 7. Prosecutor's closing argument

Petitioner contends he was denied the right to effective assistance of counsel when his trial attorney failed to object to the Prosecutor's closing argument. The state habeas court concluded the Georgia Supreme Court had reviewed the prosecutor's argument and decided the prosecutor's closing, taken as a whole and without objections, did not result in a trial that was not fundamentally fair. Consequently, the state habeas court concluded Petitioner had not shown attorney error or prejudice.

■■■ The Court must review the prosecutor's closing argument to determine whether it rendered the sentencing phase of the trial "so fundamentally unfair as to deny him due process." *Nelson v. Nagle*, 995 F.2d 1549, 1555 (11th Cir.1993) (citations omitted). A prosecutor's argument is fundamentally unfair if it is "so egregious as to create a reasonable probability that the outcome was changed." *Id.* "The review process has two prongs: first, we must determine whether the prosecutor's closing argument was improper, and second, what was the probable effect of the improper argument on the jury." *Id.* With the first prong, the Court must determine did the comments "minimize the jury's sense of responsibility for determining the appropriateness of death." *Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985). With the second prong, the Court must determine whether the prosecutor's comments rendered the entire trial unfair. *Davis v. Singletary*, 853 F.Supp. 1492, 1569 (M.D.Fla.1994). When determining whether the prosecutor's argument affected the outcome of the trial, the "relevant

criteria include: (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." *Davis v. Zant*, 36 F.3d 1538 (11th Cir.1994).[33]

■■■ First, Petitioner argues the prosecution minimized the jury's responsibility for sentencing. The Prosecutor made the following statement: "This has been a terrible wrong and in making your judgment, the judge is going to tell you that your duty ends with the verdict and your recommendation. You're not the executioners in this case." (Respondent's Exhibit No. 1K, p. 1360).

Petitioner directs the Court's attention to *Mann v. Dugger*, 844 F.2d 1446 (11th Cir.1988),[34] *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989). In *Mann*, the petitioner was convicted of first degree murder and kidnapping. After a bifurcated trial, the petitioner was sentenced to death, per the jury's recommendation. During the course of the trial, the prosecutor made various incorrect statements, including, "your recommendation is 'simply a recommendation, and [the judge] is not bound by it.'" *Id.* at 1445. The prosecutor also stated, "you do not impose the death penalty; that is not on your shoulders ... It is not your ultimate decision. You act in that regard in an advisory capacity only." *Id.* To make the jury's role more confusing, he also stated, "[t]he ultimate responsibility rests with the Court; that it's not the jury's responsibility?" *Id.* As an endorsement of the prosecutor's statements, the trial court instructed the jury that "the final decision as to

---

**33.** Generally, "[t]he court should exclude only those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury." *United States v. Sawyer*, 443 F.2d 712 (D.C.Cir.1971).

**34.** Later, in *Davis v. Singletary*, 119 F.3d 1471, 1481 (11th Cir.1997), the Eleventh Circuit recognized *Mann* had been overruled to the extent that the Court suggested there could be a *Caldwell* violation even if the statement of the prosecutor was accurate.

what punishment shall be imposed rests solely with the judge of this court." *Id.* at 1456.

In that case the Eleventh Circuit concluded that because the trial court was required under Florida law to give great weight to the recommendation of the jury, the comments of the prosecutor were such that they would mislead or at least confuse the jury as to the nature of its sentencing responsibility under Florida law. In the case at bar, Petitioner attempts·to stretch the prosecutor's statements to make them similar to those in *Mann.* However, here, the Prosecutor did not go that far. In this case, the prosecution accurately stated that the jury's duty ends with its verdict and recommendation. The prosecutor did not suggest that the jury's role was "merely advisory." Furthermore, the prosecutor opened his argument by stating that the sentencing phase was a stage that should not be taken lightly. The prosecutor even asked rhetorically, "Did [the victim] get to have 12 people decide whether or not she was going to die?" (Respondent's Ex. No. 1K, p. 1340).[35] The prosecutor's comments here were not improper or inaccurate as in *Mann* nor were the comments misleading. *Compare, Waldrop v. Thigpen,* 857 F.Supp. 872 (N.D.Ala.1994) (argument that use of term "recommendation" tended to diminish the jury's sense of responsibility for imposition of capital sentence lacked merit even in jurisdiction where sentencing recommendations of juries had no legally binding effect on sentencing judge); *Hance v. State,* 254 Ga. 575, 332 S.E.2d 287 (1985) (affirming death sentence; prosecutor's statement to jurors that "they would not be responsible for [the defendant's] execution" did not diminish the jury's sense of responsibility or deny the defendant fundamental fairness).

Additionally, the trial court, as in *Mann,* did not repeat or make supporting statements which could have misled the jury regarding its role in the proceedings. Petitioner misconstrues the ˙trial court's statements as minimizing the jury's role. Actually, the trial court stated, "I charge you that the jury is not responsible for the consequences of its verdict, but is solely responsible for the truth of its verdict. As such, the law does not allow you to consider the manner in which the verdict of this panel will be carried out." (Respondent's Ex. No. 1K, p. 1388). The trial court accurately referred to the jury's decision as its verdict and accurately stated the law concerning what factors could be considered in reaching a verdict. Moreover, the second sentence explains any possible confusion of the first by clarifying that the manner of a possible execution should not be considered. The trial court did not lead the jury to believe its recommendation was meaningless. After instructing the jury on mitigating and aggravating circumstances, the trial court stated in no uncertain terms, "If you recommend the imposition of the sentence of death, the Court will sentence the defendant to death." (Respondent's Ex. No. 1K, p. 1386). The Prosecutor's statements did not minimize the jury's sense of responsibility in sentencing and were not otherwise improper.[36] In the absence of circumstances calling for an objection to the Prosecutor's comments, this Court finds no attorney error and no prejudice. *Compare Carr v. State,* 267 Ga. 547, 480 S.E.2d 583 (1997) (affirming death sentence; no *Caldwell* violation where prosecutor used of term "recommendation" with regard to jury's role at sentencing; prosecutor· did not a misstate of law and any possible confusion alleviated by comments during entire proceedings and charge).

---

**35.** Similarly, the prosecutor stated later in his argument, "[Y]ou have to consider whether or not Byron Parker is going to be allowed to live for what he did to Christie Ann Griffith or whether or not he's going to be allowed to die." (Respondent's Ex. No. 1K, p. 1347).

**36.** Petitioner argues this case is distinguishable from *Davis,* 119 F.3d at 1471, to the extent that the prosecutor's comments in that case were accurate statements of law. However, *Davis* is not distinguishable but analogous because in the case at bar the Prosecutor's statements were also accurate statements of law.

Second, Petitioner argues defense counsel should have objected when the prosecutor told the jury that evidence of Petitioner's mental illness or abnormal state of mind would be relevant in the sentencing phase of trial only if it rose to the level of a defense in the guilt/innocence phase.[37] Petitioner found objectionable the following statements:

> Now, think about what Dr. Eber said. He said that we got three categories, two of them everybody else accepts and he puts in a third category, and he said that this man, that a third category is that the person is so bad off. Well, that makes perfect sense. But what has that got to do with this computer printout on Byron Parker? If he was that abnormal it would have been a defense to the case, or it would have been mitigation to the guilt verdict itself. But the man is not that bad.

(Respondent's Ex. No. 1K, p. 1345). The prosecutor went on to describe the evidence of the circumstances of the crime and stated:

> Well, why do we have a statute or statutes that authorize the death penalty if that's going to be considered a mitigating circumstance? Anybody that has the ability to unprovoked walk up to somebody and choke them down to their knees, and then let them up or if they get back up choke them back down. Are we going to say that every time you do this to an 11–year–old little, redheaded girl that we are going to assume you're crazy? Everybody that does an unprovoked murder of that degree or any lesser degree is not normal.

(Respondent's Ex. No. 1K, p. 1346).[35] The prosecutor's comments were not improper but were within the scope of permissible arguments. The prosecutor identified the evidence presented and argued reasonable inferences to be drawn from the evidence. The prosecutor did not, as Petitioner contends, tell the members of the jury they could not consider evidence of mental illness in mitigation, but characterized Petitioner's evidence as weak. *Compare, Cargill v. Turpin,* 120 F.3d 1366 (11th Cir. 1997) (prosecutor's statements not prejudicial; prosecutor permitted to argue that mitigating evidence presented to jury by the defendant was of little force); *Carr,* 267 Ga. at 558, 480 S.E.2d at 594 (prosecutor may argue that evidence presented by the defendant during sentencing is not mitigating). Therefore, there was no attorney error or prejudice in the failure to object to the prosecutor's comments.

Petitioner also found objectionable an excerpt from the following statement:

> What kind of rights did Christie Ann Griffith get while she was sitting there getting choked by Byron Parker? We have a Constitution that says that she has the right to life, liberty and the pursuit of happiness. And it says that Byron Parker has certain rights and those are one of them or those are three of them. He's got a right to a jury trial, to Miranda warnings before he talks to the police. He's got all these rights. Which ones were given to Christie Ann Griffith right before she dropped to her knees for the first time.
>
> . . . . .
>
> In our society we've got to have the nerve to pass the final judgment when somebody can take an 11–year–old girl, strangle her with their hands, then with the cord, leave her in the woods, go out and have supper afterwards, if we can't give the death penalty for it we are saying that murder, especially this one,

---

**37.** The state habeas court's ruling addressed the Prosecutor's closing argument in its entirety and found no attorney error in the failure to object and no prejudice.

**35.** Petitioner contends the failure to object to these statements could not have been trial strategy because Petitioner's counsel argued on direct appeal that the prosecutor's remarks constituted prejudicial error. However, what defense counsel perceives, in hindsight, to be error is not necessarily a reflection of what competent, reasonable counsel would have done at the time of trial.

is not very grave, is not really anything wrong with it. And we are saying that we no longer have the ability or the strength to pass judgment upon the most horrendous crimes in our society. *We are saying that Christie Ann Griffith's life is cheap.* (emphasis added)

(Respondent's Ex. No. 1K, pp. 1339–58). Petitioner argues the above comments were highly inflammatory and improper because they urged the jury to base its sentencing verdict on constitutionally impermissible factors. While Petitioner correctly asserts that the prosecutor may not call attention to the defendant's exercise of constitutional rights as a ground for discrediting his defense, the Prosecutor in the case at bar did no such thing. *See Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965) ("[T]he Fifth amendment in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."). The Prosecutor's arguments did not seek to discredit the defense because of the exercise of his constitutional rights. Here, as in *Brooks v. Kemp,* 762 F.2d 1383, 1411 (11th Cir.1985), *cert. granted and judgment vacated,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732, (1986), *opinion reinstated,* 809 F.2d 700 (11th Cir.1987), the prosecutor sought to compare the death of the victim to the proceedings leading up to the possible execution of Petitioner. The Prosecutor did not attempt to chastise or mock Petitioner's exercise of his right to a jury trial, *Miranda* rights or other rights provided by the Constitution. *Compare Brooks,* 762 F.2d at 1411 (court found prosecutor's remarks regarding the defendants "battery of lawyers," the absence of a "judge . . . ruling on evidence" and getting "twenty strikes when the jury was selected" not improper).

The case at bar is in no way similar to *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir.1991), cited by Petitioner. In *Cunningham,* the prosecutor stated that he was personally offended that the defendant had exercised his Sixth Amendment right to a jury trial. Here, the prosecutor did not suggest that Petitioner had done something wrong by exercising his constitutional rights or in any way "abused the legal system" as in *Cunningham* but suggested that Petitioner had committed a wrong by taking the life of the victim. 928 F.2d at 1019.

The remaining comments identified by Petitioner were not improper. The Court finds no attorney error and no prejudice in defense counsel's failure to object to the Prosecutor's closing argument.

8. **Failure to call Petitioner to the witness stand**

■ Although Petitioner contends counsel was ineffective in failing to call him as a witness during either phase of the trial, the state habeas court ruled this claim was without merit. The state habeas court found counsel informed Petitioner of his right to testify and Petitioner chose not to take the stand. Also, the state habeas court found counsel made a tactical decision not to call Petitioner as a witness.

Here, Petitioner argues counsel's failure to call Petitioner as a witness and counsel's advice to Petitioner regarding testifying was professionally unreasonable and left the prosecution's case unrebutted and strengthened. Under *United States v. Teague,* 953 F.2d 1525, 1532 (11th Cir. 1992), *cert. denied,* 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992), a criminal defendant has a fundamental constitutional right to testify at trial and this right is personal to the defendant and cannot be waived either by the trial court or by defense counsel.[36] Here, Petitioner does

---

**36.** Respondent contends Petitioner's argument relies on *United States v. Teague* and the rule espoused in that case is a new rule inapplicable to Petitioner's present collateral attack of his conviction and sentence. *See Teague v. Lane,* 489 U.S. at 316, 109 S.Ct. at 1078 (new rules are generally to be excluded from application on collateral review).

not argue he was denied the right to testify but argues counsel's advice regarding giving testimony was professionally unreasonable.[37]

The Court finds no attorney error with respect to this claim. The decision of defense counsel to advise Petitioner not to testify and to not present Petitioner as a witness was strategic and professionally reasonable. (Respondent's Exhibit No. 2G, pp. 132, 135). Petitioner's wishes regarding testifying were not ignored or rejected neither was Petitioner misinformed about his right to testify. Counsel did not want to subject Petitioner to harmful cross-examination during either phase of the trial. *Compare, Devier v. Zant,* 3 F.3d 1445 (11th Cir.1993) (affirming district court's ruling that counsel made a reasonable, tactical decision that the defendant would not testify because he had made a negative impression on the jury); *Robison v. Johnson,* 151 F.3d 256 (5th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999) (affirming denial of petitioner request for relief where petitioner failed to show that trial counsel performed deficiently in advising and persuading petitioner to testify and counsel's strong recommendation not to testify represented reasonable trial strategy); *Emery v. Johnson,* 940 F.Supp. 1046 (S.D.Tex. 1996) (counsel had sound strategic reasons for advising the petitioner not to testify and the advice given was reasonable). The Court also finds no prejudice with respect to either phase of trial. Although the Tague Affidavit contains much speculation as to what Petitioner's testimony could have been and how such testimony would have been favorable to Petitioner, such testimony is noticeably absent from Petitioner's Affidavit. Without Petitioner's testimony, the State's case did not remain unrebutted and strengthened. Counsel successfully cross-examined witnesses who took the stand during both phases of the trial. Petitioner also argues that without any explanation as to the how's and why's of the killing, the jury was more likely to impose the death sentence. However, the forensic evidence including Petitioner's confession made any explanation of Petitioner's motive insignificant. Any exculpatory or mitigating testimony from Petitioner would not have created the reasonable probability of a different outcome at either phase of the trial.

### 9. Failure to use peremptory challenges

Petitioner contends counsel should have excused two jurors who indicated during voir dire that they had prejudged Petitioner's guilt. During voir dire, venireman Kerley responded to one of counsel's questions by stating, "Well, I feel there is a great possibility that he's guilty. I would like to see that he's not, you know, I would like to know the reasons that he would not be." Respondent's Ex. No. 1G, p. 267. Later, when asked if she thought Byron Parker was guilty, she again stated, "Well, I think there is a great possibility that he is, yes." Respondent's Ex. No. 1G, p. 268. Thereafter, defense counsel sought to have venireman Kerley stricken for cause. When asked if she could, if selected, decide the case based only on the evidence, Kerley responded, "I feel sure.... I think so, certainly, in any case."[38] Consequently,

---

37. The averments of Petitioner's affidavit suggest that Petitioner contends he was denied the right to testify. Petitioner testified by affidavit that both attorneys discussed with him the issue of whether he would be a witness at trial, but only by instructing Petitioner that, if asked whether he would testify, to state that he would be a witness. Petitioner also stated that, contrary to counsel's testimony, he never stated that he did not want to testify at trial. Nevertheless, Petitioner has clearly stated in his brief that the issue with regard to this claim is not whether he was denied the right to testify, but whether counsel's advice regarding Petitioner's testifying was reasonable.

38. When questioned further venireman Kerley also stated, "I think that I am an impartial person. I must know both sides of every story, every story has two sides[.]" Respondent's Ex. No. 1G, p. 275. Furthermore, the record demonstrates that venireman Kerley knew defense counsel Krontz's wife through work.

the trial court denied defense counsel's motion.

During voir dire when venireman House was questioned he stated, "Well I would say that from what I have heard it seems like a strong case against the defendant.... I can't help the things that I have read in the past. I can't avoid bringing them to bear on the current case." (Respondent's Ex. No. 1G, p. 521). However, venireman House also stated, "I would think that the evidence I would hear in the case would affect me more strongly than information I had heard." [39] (Respondent's Ex. No. 1G, p. 520). Defense counsel moved to strike House for cause, and the trial court denied the motion.

Defense counsel, having used nine of twenty peremptory strikes available, did not strike venireman Kerley. *See* O.C.G.A. § 15–12–165 (1994).[40] Venireman House was selected as the second alternate with no defense strikes remaining. The state habeas court ruled the two veniremen did not meet the standard to be stricken for cause and there was no attorney error or prejudice in counsel's decision not to strike either juror.

■ The Sixth Amendment guarantees the right to a fair trial and a fair and impartial jury. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Petitioner argues counsel should have stricken veniremen whom the trial court concluded were not biased and could not be excused for cause. However, to show attorney error and prejudice in defense counsel's failure to use peremptory strikes for such veniremen, it is necessary for Petitioner to show that the veniremen did indeed harbor actual bias against Peti-

tioner. *Compare, Rogers v. McMullen,* 673 F.2d 1185, 1189 (11th Cir.1982) (a defendant's Sixth Amendment right to a fair and impartial jury is not violated unless the defendant can show that a member of the jury which heard his case was biased); *Goins v. Angelone,* 52 F.Supp.2d 638 (E.D.Va.1999) (where record did not support petitioner's claim that the challenged jurors were biased against him, failure to raise claim on appeal did not constitute ineffective assistance of counsel).

■ The question of individual juror bias is a question of fact. *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). Consequently, under 28 U.S.C. § 2254(d), the trial court's findings of individual juror bias are entitled to a presumption of correctness. Therefore, because the trial court found each juror impartial and unbiased, this Court cannot conclude defense counsel erred in failing to use peremptory strikes to excuse venireman House [41] or venireman Kerley or that any prejudice resulted from such failure. *But see Davis v. Singletary,* 853 F.Supp. 1492 (M.D.Fla.1994) (petitioner failed to show counsel was ineffective in exercising peremptory strikes where counsel attempted to have veniremen stricken for cause *and* used peremptory strike where motion to excuse was denied) and *Odle v. Calderon,* 919 F.Supp. 1367 (N.D.Ca.1996) (where there was an absence of evidence in the record of voir dire which would have caused a reasonable attorney to doubt that the venireman could be an unbiased juror, no attorney error in failing to strike venireman). Petitioner's argument reflects a lack of appreciation

---

**39.** While venireman House may have stated that he had certain impressions from reading the newspaper, House never stated that he could not set aside his initial impressions and listen to the evidence and obey the Court's charge. (Respondent's Ex. No. 1G, p. 522).

**40.** *See also* Code 1933 § 59–805.

**41.** Petitioner notes that defense counsel had two peremptory challenges left when the full 12–member jury had been selected and alter-

nates were being selected. However, Defense counsel could not have stricken venireman House. Defense counsel had used its two remaining strikes on two other veniremen by the time venireman House was called, and the State had used its only remaining strike. Consequently, venireman House was automatically selected as the final alternate. With no strikes available, defense counsel could not possibly have erred in not striking venireman House.

for the innumerable factors involved in the jury selection process. Using hindsight, it is easy identify a juror defense counsel should have stricken. However, during the jury selection process counsel had to determine who he would prefer to be on the jury, who he would prefer to be excused and organize each venire member in terms of the degree of that preference, while simultaneously estimating who the prosecution would seek to select and strike. While the Court does not intend to suggest that a habeas petitioner could never have a valid ineffective assistance of counsel claim for the failure to use peremptory strikes, Petitioner here failed to come close to demonstrating attorney error.

10. Failure to Object to a Deputy Sheriff's Participation in the Jury Panel

█ Petitioner argues his constitutional right to a fair and impartial jury was violated by the participation in the jury panel of a Douglas County deputy sheriff who was a prosecution witness at trial. During voir dire, Officer James R. Skinner identified his place of residence and occupation, at which time the State told the Court it intended to call Skinner as a witness. (Respondent's Ex. No. 1G, p. 433). Defense counsel moved to strike Skinner for cause and the motion was granted. (*Id.*, p. 434). The state habeas court ruled that because Petitioner failed to show actual bias on the part of any juror selected for the case, Petitioner had not shown attorney error or prejudice. Petitioner contends reasonably competent counsel would have objected or requested that the Court inquire into the extent of possible prejudice as a result of Skinner's contact with members of the jury panel.

In *Turner v. State of Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965), the United States Supreme Court held extreme prejudice is inherent in the continual association throughout trial between members of the jury and key prosecution witnesses and such association results in a violation of the defendant's due process rights under the Fourteenth

Amendment. In that case, the Supreme Court reversed and remanded the defendant's murder conviction because two deputies who were in charge of the jury during the course of the trial and who had fraternized with members of the jury outside the courtroom while performing their official duties also testified for the prosecution with regard to the investigation, arrest, and confession of the defendant.

Under *Turner*, Petitioner must show Skinner's presence on the jury panel resulted in inherent prejudice to Petitioner which reasonable counsel would have recognized, raised an objection and questioned members of the panel regarding actual prejudice. To prevail on this claim, Petitioner must also show that but for defense counsel's error there is a reasonable probability the result of the proceeding would have been different.

In the case at bar, Skinner was immediately excused once defense counsel became aware that he was a participant in the venire. Skinner, unlike the deputies in *Turner*, was not in charge of the venire or the petite jury. Therefore, Skinner was not in a position of trust and did not have the opportunity to establish credibility with veniremen inside or outside the courtroom. The Court cannot assume Skinner interacted with members of the venire and tainted the pool. There is no evidence Skinner's presence before being excused in any way created an aura of authority and trustworthiness. The circumstances of the case at bar do not demand the conclusion that inherent prejudice lies within a key prosecution witness's presence on the jury panel. If such were the case, many a defendant would automatically be entitled to a new trial based on a witness's presence for jury service. This Court agrees with the state habeas court's ruling that counsel's failure to move to strike Skinner sooner and allowing Skinner the mere opportunity to discuss the case and develop a rapport with members of the venire is insufficient to show attorney error.

Even if the Court assumes defense counsel erred in failing to at least question Skinner and members of the jury panel regarding their interaction and the possibility of prejudice, Petitioner cannot show that but for defense counsel's failures, the result of the trial would have been different. Petitioner argues Skinner's presence on the panel for two days could only have enhanced his credibility; however, the Court concludes Skinner's presence had no effect. The evidence against Petitioner was overwhelming; consequently, any possible prejudice from defense counsel's failure to object or question the jury panel is insignificant. *Compare, Lucero v. Kerby,* 133 F.3d 1299 (10th Cir.1998) (presence of victim's brother on jury panel and brother's prior association with veniremen in previous trial of unrelated case did not establish a presumption of prejudice);[42] *Mach v. Stewart,* 137 F.3d 630 (9th Cir. 1997) (jury panel's exposure to intrinsically prejudicial *statements* by venireman during voir dire permitted court to presume that at least one juror was tainted thereby violating the petitioner's due process rights); *United States v. Delval,* 600 F.2d 1098, 1102 (5th Cir.1979) (mere presence in jury venire of a former DEA informant who had no involvement in narcotics case before the court did not require quashing of entire venire; "highly attenuated risk of prejudice" and lack of "specific allegations of improper communications" did not "overcome general presumption in favor of jury impartiality.").

11. Juror bias from viewing Petitioner in a holding cell

◼ Petitioner contends he received ineffective assistance when his counsel failed to explore juror bias allegedly re-

sulting from viewing Petitioner in a locked holding cell during trial recesses. After questioning the third venire panel and before questioning the fourth, defense counsel moved to excuse the third and fourth panels because they had seen or at least had the opportunity to see Petitioner in a holding cell. (Respondent's Ex. No. 1G, pp. 316–317). Counsel argued seeing Petitioner in a holding cell was the equivalent to seeing Petitioner in shackles and the tainted jury violated Petitioner due process rights. (*Id.*). The trial court denied counsel's motion. (*Id.* at 318).

The Prosecutor denied that members of the panel had seen Mr. Parker in the holding cell and stated that defense counsel could question the fourth panel about any such incident and prejudice. (*Id.* at 319). At the state habeas hearing, defense counsel testified that he didn't recall any juror having actually seen Mr. Parker in the holding cell. (Respondent's Ex. No. 2G, p. 28). Defense counsel also explained that he decided not to ask the jurors about the incident in order to not highlight the fact or prejudice members of the panel who did not know Mr. Parker was being held in a cell. (*Id.*). The state habeas court concluded counsel's decision not to question the venire panels on the issue was strategic and there was no attorney error.[43]

◼ Under *Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986), when a courtroom arrangement is challenged as inherently prejudicial, the court must determine whether " 'an unacceptable risk' " " 'of impermissible factors is present.' " (quoting *Estelle v. Williams,* 425 U.S. 501, 505, 96

---

42. The petitioner here, like the petitioner in *Lucero,* "seeks to establish a presumption of prejudice from what was, at most, a few days contact in a fairly structured and formal setting." 133 F.3d at 1309. As in *Lucero,* this Court cannot conclude Petitioner's constitutional right to an impartial jury was violated.

43. The state habeas court's ruling implies that there was no evidence any member of the jury

had actually seen Petitioner in the holding cell. (Respondent's Ex. No. 2E, p.2079). Because of the absence of such a factual finding, this Court is not required to accept the conclusion that no member of the jury saw Petitioner in the holding cell. In contrast, the. record as cited in Petitioner's brief, supports the finding that members of the venire at least had the opportunity to view Petitioner in the holding cell.

S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976).) However, with Petitioner's claim couched within an ineffective assistance claim, actual prejudice remains an issue. To prevail on this claim, Petitioner must show that viewing Petitioner in the holding cell was inherently prejudicial, reasonably competent counsel would have explored juror bias from the incident, and as a result of the failure to inquire into juror bias, Petitioner was prejudiced thereby.

The presence of shackles may erode the presumption of innocence and violate the accused's right to a fair and impartial jury. *United States v. Mayes*, 158 F.3d 1215, 1225 (11th Cir.1998). However, here, the restraint was not so severe. Placing Petitioner in a holding cell during recess was the least restrictive method of restraint.[44] *See Mayes*, 158 F.3d at 1226. Furthermore, "A jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom [does] not warrant habeas relief." *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir.1999). *See also Schiro v. Clark*, 963 F.2d 962, 976 (7th Cir.1992) ("A juror's inadvertent observation of a defendant in shackles and manacles outside the courtroom is presumptively non-prejudicial unless the defendant can affirmatively show that jurors were prejudiced by the encounter.").

Additionally, the trial court made clear its concerns regarding Petitioner's safety and took reasonable measures to protect Petitioner. (Respondent's Ex. No. 1F, p. 15; Respondent's Ex. No. 1G, p. 317). Consequently, the Court concludes viewing Petitioner in a holding cell was not inherently prejudicial. Defense counsel, acting as reasonably competent counsel, made the tactical decision not to reveal or emphasize to members of the venire that Petitioner was at times housed in the holding cell. Moreover, Petitioner failed to show he was prejudiced at the culpability phase or the sentencing phase by any possible error. It is highly unlikely that any venireman who had viewed Petitioner in the holding cell had not simply concluded that Petitioner was unable to post the required bond. *See United States v. Halliburton*, 870 F.2d 557, 560 (9th Cir.1989). Petitioner's counsel's performance in this area was not professionally unreasonable, and Petitioner's ineffective assistance claim must fail.

12. **Failure to raise claims on direct appeal**

 Petitioner's counsel represented him at trial and on direct appeal to the Georgia Supreme Court. Petitioner contends counsel was also ineffective on direct appeal by failing to raise certain meritorious claims.[45] "The standard for ineffective assistance is the same for trial and appellate counsel." *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir.1987). To resolve this type of claim, the district court must examine the alleged trial error and determine if it contains sufficient merit warranting a finding of attorney error and actual prejudice on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984); *Wright v. Hopper*, 169 F.3d 695,

---

44. "The degree of prejudice is a function of the extent of chains applied and their visibility to the jury. In other words, the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice." *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir.1989).

45. Petitioner's brief listed the following unasserted claims: (1) the trial court's failure to suppress Petitioner's statements to the police on the grounds that the were involuntary and coerced, (2) the trial court's erroneous sentencing phase jury instruction, (3) the prosecutor's improper remarks during closing argument of the sentencing phase, (4) the failure of the expert psychologist to undertake a minimally competent examination of Petitioner, (5) the trial court's failure to prevent prejudice resulting from the presence of Deputy Sheriff Skinner in the jury venire, (6) the trial court's failure to prevent the prejudice resulting from viewing Petitioner in a locked holding cell during trial recesses, (7) the trial court's failure to take action to correct the jury's exposure to unrelated criminal charges against Petitioner, and (8) other issues which would be barred from federal habeas review. Petitioner's Opening Brief [15-1], p. 232. The Court concludes claims (2), (3), (4), (5), (6), and (8) are without merit because Petitioner cannot show prejudice.

708 (11th Cir.1999) (petitioner failed to show outcome of appeal would have been different); *Matire*, 811 F.2d at 1439 (petitioner demonstrated actual prejudice by showing "there was more than a reasonable probability that the outcome of the appeal would have different."); *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir.1990) (petitioner required to show appellate counsel's error affected outcome of appeal).

Mr. Krontz, Ms. McLeod and Mr. Snead represented Petitioner on direct appeal. All three attorneys testified that they decided to raise on direct appeal those claims which they determined had merit. (Respondent's Ex. No. 2G, pp. 146, 161). The state habeas court concluded Petitioner failed to demonstrate attorney error or prejudice.

Petitioner contends appellate counsel should have raised on direct appeal the trial court's failure to suppress Petitioner's statements to the police on the basis that the statements were involuntary and coerced. This argument was raised on direct appeal, and Petitioner's claim is without merit. *See Parker v. State*, 255 Ga. 167, 168, 336 S.E.2d 242, 243 (1985). As a result, the Georgia Supreme Court remanded the case for clarification on the admissibility of any statements or confessions made by Petitioner. *See Parker*, 255 Ga. at 168, 336 S.E.2d at 243. With respect to this claim, Petitioner failed to show attorney error or prejudice. *Compare, Funchess v. Wainwright*, 772 F.2d 683, 695 (11th Cir.1985) (where defense counsel failed to raise issue on first appeal but issue was fully briefed on second appeal, petitioner failed to show that he was prejudiced by defense counsel's previous inaction).

Petitioner also contends appellate counsel should have raised on appeal the trial court's failure to take action to correct the jury's exposure to unrelated criminal charges against Petitioner. This claim was also raised and decided on direct appeal against Petitioner. (Respondent's Ex. No. 1M, p. 43); *see also Parker*, 255 Ga. at

169, 336 S.E.2d at 243. Because Petitioner failed to show attorney error and prejudice, this claim is also without merit.

Petitioner, having failed to demonstrate his right to effective assistance of counsel was violated, must demonstrate other grounds for cause and prejudice before the Court may consider any claim which Petitioner procedurally defaulted. Petitioner also failed to show the failure to address any procedurally barred claim would result in a miscarriage of justice.

C. Statements to Law Enforcement Officers in Violation of Fifth and Sixth Amendment Rights

Petitioner contends various statements to law enforcement officers were obtained and admitted into evidence in violation of his Fifth and Sixth Amendment rights.

1. Sixth Amendment—Right to Counsel and June 8, 1984 Hearing

 Petitioner argues under *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), authorities continued interrogating Petitioner even after adversarial proceedings had begun and Petitioner had invoked his right to counsel. In response, Respondent contends Petitioner has procedurally defaulted any claims regarding statements based on alleged violations of the Sixth Amendment right to counsel. Respondent contends Petitioner cannot now argue that his Sixth Amendment right to counsel was violated because under O.C.G.A. § 9–14–51 this ground is procedurally defaulted due to Petitioner's failure to raise the issue on direct appeal and his failure to specifically plead the issue in the amended state habeas petition. Furthermore, Respondent contends the state habeas court did not address the issue but relied upon an independent and adequate state law ground in disposing Petitioner's state court habeas action.

 Petitioner contends the admission of his statements given on or about June 8, 12, and 13, 1984 violated Petitioner's right

to counsel because he had invoked his right to counsel. Petitioner contends he invoked the right to counsel on June 7, 1984; several occasions after his polygraph on the same day; again at a hearing on June 8, 1984; and again on June 12, 1984 when he completed a form for court appointed counsel. Respondent answered this allegation contending Petitioner never argued on appeal that his Sixth Amendment right to counsel attached at any June 8, 1984 hearing and the Georgia Supreme Court was not sufficiently alerted to Petitioner's *Michigan v. Jackson* claim.[46] The state habeas court held claims regarding the alleged violation of the right to counsel were precluded from review because they were decided on direct appeal. (Respondent's Ex. No. 2E, pp. 2029–30).

Generally, the Georgia Supreme Court found no violation of Petitioner's Sixth Amendment rights; however, Petitioner's present claim, centering around the June 8 hearing was not raised on direct appeal to the Georgia Supreme Court. The original state habeas petition, filed July 24, 1987, does not include any reference to a June 8, 1984 hearing in which Petitioner allegedly invoked his right to counsel. The first amended attachment, filed November 18, 1988, which specifically supersedes the first attachment, does not include a claim based on a June 8, 1984 invocation of the right to counsel. Petitioner also omitted any such claim from his second amended attachment, filed March 12, 1990. However, the state habeas court heard evidence on the issue and Petitioner argued the issue in his Opening Post–Hearing Brief. (Respondent's Ex. No. 2D, pp. 1145, 1179–88).

Respondent argues the Court should find Petitioner's Sixth Amendment right to counsel claim procedurally barred. Re-

spondent supports this argument by referring to *Lindsey v. Smith*, 820 F.2d 1137 (11th Cir.1987). In *Lindsey*, the petitioner argued the state coram nobis court must have resolved some of his claims on the merits although the court summarily denied the petitioner's claims without stating that the decision rested on a state procedural bar. The Eleventh Circuit held the petitioner never raised a facially sufficient claim of a violation of his Equal Protection rights under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) before any state court and because Alabama law requires that the failure to raise such a claim at trial or on direct appeal constitutes a procedural bar to raising the claim in collateral proceedings, the petitioner's claim was procedurally barred in spite of the state court's failure to explicitly find the claim procedurally barred. *See also Collier v. Jones*, 910 F.2d 770 (11th Cir.1990) (when petitioner fails to present claim to the state court and under a state procedural rule the claim is procedurally defaulted, the claim should be considered defaulted in federal court). Petitioner argues Respondent's reliance on *Lindsey* is misplaced because the state habeas court in *Lindsey* stated no grounds for denying the petition and the petitioner failed to raise his claim before the state coram nobis court. Petitioner's effort to distinguish *Lindsey* is superficial. While the *Lindsey* state habeas court stated no grounds for the denial, the state habeas court here plainly stated its grounds although not supported by the record. Moreover, both the *Lindsey* petitioner and Petitioner here failed to raise the asserted claim when given an earlier opportunity to do so. Consequently, in spite of the state habeas court's inaccurate assertion regarding the basis of the procedural bar, the court, al-

---

**46.** A claim under *Michigan v. Jackson*, is based on a violation of the Sixth Amendment right to counsel where a defendant has been formally charged with a crime, requested counsel but was not afforded an opportunity to consult with counsel before the police initiated further interrogations. 475 U.S. at 626, 106 S.Ct. at 1406. Consequently, where the

police initiate interrogation after a defendant has asserted the right to counsel at an arraignment or similar proceeding, any waiver of the defendant's right to counsel obtained from police-initiated interrogation is invalid. *Michigan v. Jackson*, 475 U.S. at 636, 106 S.Ct. at 1411.

though given an opportunity to decide Petitioner's claim on the merits, did not do so.[47]

Petitioner argues the state habeas court's ruling rests on non-procedural grounds because the state habeas court was presented with argument and evidence supporting this claim. Although the Court concedes Petitioner presented the merits of the claim to the state habeas court, the Court must reject Petitioner's argument because it is circular. The mere fact that a claim is raised, argued, and briefed does not suggest that the court's ruling with regard to that issue rests on non-procedural grounds regardless of the court's stated basis for the ruling. Although a rule preventing relitigation in state post-conviction proceedings of claims raised and decided on direct appeal may not constitute a procedural bar to federal habeas review, Petitioner's claim was not raised and decided on direct appeal. *See Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir.1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 804, n. 3, 111 S.Ct. 2590, 2595, n. 3, 115 L.Ed.2d 706 (1991) ("[A] later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default[;] its effect upon the availability of federal habeas is nil[.]").

Petitioner's failure to raise this particular Sixth Amendment claim at the trial level or on direct appeal constitutes a procedural default of his federal claim in the state courts.[48] Under O.C.G.A. § 9–14–48(d) the state habeas court must review the trial record and transcript of proceedings to determine whether the petitioner complied with Georgia procedural rules at trial and on appeal. The state habeas court is prohibited from excusing a procedural default in the absence of a showing of cause and actual prejudice. O.C.G.A. § 9–14–48(d). In the state habeas action, Petitioner failed to comply with Georgia procedural rules at trial and on appeal and the state habeas court would now find the claim procedurally barred. For purposes of state habeas review, Petitioner has defaulted any claim that his Sixth Amendment right was violated as a result of questioning which occurred after the June 8th hearing.[49] *See Black v. Hardin*, 255 Ga. 239, 336 S.E.2d 754 (1985) (a failure to

---

**47.** Here, exhaustion is not an issue. Because the state habeas court was given an opportunity to decide the claim on its merits, the claim is exhausted. Subsection (b)(2) of section 2254 permits a district court to deny an application on the merits in spite of the petitioner's failure to exhaust his state court remedies. 28 U.S.C. § 2254(b)(2). "When deciding whether the Court may deny a petition on the merits, pursuant to § 2254(b)(2), the test is whether it is 'perfectly clear' that the petitioner has failed to state 'even a colorable claim.'" *Gaylor v. Harrelson*, 962 F.Supp. 1498, 1500 (N.D.Ga.1997) (quoting *Granberry v. Greer*, 481 U.S. 129, 134–135, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987).)

**48.** Petitioner argues Respondent's procedural default argument is factually and legally flawed. However, it is Petitioner's argument that is flawed as evidenced by his failure to address the fact that although he did argue on direct appeal that his Sixth Amendment right to counsel was violated, Petitioner did not argue that the right attached at a June 8th hearing. Petitioner contends "the Supreme Court of Georgia expressly rejected Petitioner's Sixth Amendment claim, finding that '[n]o confessions were elicited after the initiation of adversary judicial proceedings.'" *Parker v. State*, 256 Ga. at 548, 350 S.E.2d at 574. However, with regard to this particular ruling, the Georgia Supreme Court did not state that Petitioner had asserted that his Sixth Amendment right to counsel attached at a June 8, 1984 hearing. Therefore, the Court cannot conclude the Georgia Supreme Court addressed the merits of this claim. Also, Petitioner argues that his Fifth Amendment rights under *Edwards* were violated subsequent to Petitioner's request for counsel at the June 8 hearing. However, this particular claim is also procedurally defaulted.

**49.** In *Engle v. Isaac*, 456 U.S. 107, 125 –126, n. 28, 102 S.Ct. 1558, 1570–1571, 71 L.Ed.2d 783 (1982), the United States Supreme Court stated that the issues of waiver and exhaustion are separate and distinct. Exhaustion refers to "remedies still available at the time of the federal petition." *Id.* If state court collateral relief is unavailable, the claim is exhausted.

make timely objection to any alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus). "A federal court must dismiss those claims or portions of claims that are procedurally barred under state law." *Sims v. Singletary,* 155 F.3d 1297, 1311 (11th Cir.1998) (citations omitted). Therefore Petitioner's claim of the assertion of his right to counsel at a June 8, 1984 hearing must be dismissed.[50]

■ Where a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.[51] *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565. Petitioner cannot show counsel's failure to raise issues flowing from the June 8 hearing constitutes attorney error or resulted in prejudice. Petitioner also failed to demonstrate any other valid reason to excuse the procedural default. Therefore, the Court cannot consider Petitioner's claim that he invoked his Sixth Amendment right to counsel at a June 8 hearing and his right to counsel was violated by government initiated questioning thereafter.[52] With respect to Petitioner's contentions that he invoked his right to counsel at other specified times, the Court does not find that the Georgia Supreme Court's ruling resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable interpretation of the facts.

2. Fifth Amendment—*Edwards v. Arizona*

■ Under *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." In *Edwards,* the Court also limited the circumstances under which an accused may waive his right to counsel by holding that once an accused has expressed his desire to deal with the police only through counsel, further interrogation is prohibited until counsel has been made available to the accused unless the accused himself initiates further contact. *Edwards,* 451 U.S. at 484–485, 101 S.Ct. at 1885.

■ Petitioner contends his Fifth Amendment rights under *Edwards* were

**50.** Petitioner argues that under *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) the federal court is not precluded from considering this claim because the last state court rendering a judgment on this claim did not clearly and expressly state that its judgment rested on a state procedural rule. However, *Harris* only applies where the decision of the last state court in which the claim was presented can be construed as resting primarily on federal law or interwoven with federal law. *See Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557. Here, the state habeas ruling did not rest on federal law but on a state procedural rule.

**51.** Although Petitioner argues the state habeas court's ruling rests on non-procedural grounds, he does not argue, alternatively, that the state habeas ruling is not based on an independent and adequate state procedural rule.

**52.** Even if the Court were to conclude that at the June 8 hearing Petitioner requested counsel, such request is not equivalent to invoking the Fifth Amendment right to counsel in custodial interrogations. *Compare Collins v. Francis,* 728 F.2d 1322, 1332–33 (11th Cir. 1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984) (petitioner's "request for counsel at his arraignment did not place his request in the *Miranda/Edwards* fifth amendment right-to-counsel posture." "Rather, petitioner indicated at arraignment that he desired counsel in the sixth amendment sense, to handle his case."). Where counsel is requested at a an arraignment or similar proceeding the Sixth Amendment as construed in *Michigan v. Jackson* would apply. However, this Court has found Petitioner's *Michigan v. Jackson* claim procedurally defaulted.

violated because he was interrogated after invoking his right to counsel on June 7, 1984. Petitioner contends the decision of the Georgia Supreme Court on this issue was contrary to or involved an unreasonable application of clearly established federal law and was based on an unreasonable interpretation of the facts. Specifically, Petitioner argues questioning after June 7, 1984, was police-initiated.

On June 7, 1984 at approximately 1:30 p.m., Petitioner was arrested on unrelated charges. (Respondent's Ex. No. 1E, p. 37). Douglas County Sheriff Earl Lee talked to Petitioner later that afternoon concerning Petitioner taking a polygraph test. (Respondent's Ex. No. 1E, pp. 188–190). Petitioner told Sheriff Lee he wanted to talk to his lawyer before taking a polygraph test. (Respondent's Ex. No. 1E, p. 190). Petitioner then contacted Don Jones, an attorney. Sheriff Lee also spoke with Jones and it was agreed that Petitioner would meet with Jones at the Federal Bureau of Investigations headquarters and at that time determine whether Petitioner would take the polygraph test. (Id.).

At the FBI headquarters, Petitioner spoke with Jones in private sometime after 5:00 p.m. (Id. at 191, 109). Jones then spoke with Sheriff Lee and Lee understood that Petitioner would take the test. (Id.). Jones advised Petitioner not to answer any questions. (Id. at 149). However, Jones was not present for the test, but he asked Petitioner and/or Sheriff Lee to call him upon completion of the test. (Id. at 150, 193). Before leaving the FBI headquarters, Jones also told Petitioner to keep his "mouth shut" after the polygraph test. (Respondent's Ex. No. 2F, p. 108). Both

Petitioner and Sheriff Lee attempted to contact Jones after the test was over, but they were not able to reach him. (Id. at. 194).

Petitioner was then taken back to the Douglas County jail at which time he was interviewed by Mike McGinnis at approximately 8:30 p.m. (Respondent's Ex. 1E, p. 38). Before interviewing Petitioner, Detective Jerry Wynn advised him of his Miranda rights. (Id.) Petitioner agreed to talk to Wynn and McGinnis without an attorney and never asked for an attorney during the course of their conversation. (Id. at. 39).

At approximately 10:30 p.m., Georgia Bureau of Investigations Agent Bob Ingram met with and questioned Petitioner. (Id. at 158). Before questioning Petitioner, Agent Ingram advised him of his Miranda rights. (Id. at. 159). The interview last about two hours during which time Petitioner never asked for an attorney. (Id. at 160, 162). Sheriff Lee was in the room during the last fifteen minutes of the interview. (Id. at 160).

Upon completion of the interview, law enforcement officials went to a location mapped out by Petitioner and found the body of the victim at approximately 1:30 a.m. (Respondent's Ex. No. 1H, p. 682, 684). After Sheriff Lee had discovered the victim's body, he was able to reach Jones sometime during the early morning hours of June 8, 1984. (Id. at p. 194).

The Georgia Supreme Court concluded Petitioner had invoked his right to counsel. However, that Court limited Petitioner's assertion of his right to the context of the polygraph exam.[53] This Court concludes

---

**53.** At the time of the Georgia Supreme Court's decision there was no Supreme Court precedent recognizing a limited or partial assertion of the right to counsel. However, in *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Court reversed and remanded a Connecticut Supreme Court decision holding that the defendant's incriminating statements should have been suppressed under *Edwards* because, although the defendant had stated his willingness to speak to police, he also indicated that he would not make a written statement outside the presence of counsel. The Court explained that the defendant had made his intentions clear: he would talk, but he would not make a written statement. The Court stated, "To conclude that [the defendant] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [the defendant's] statement." *Barrett*, 479 U.S. at 529–530, 107 S.Ct. at 832.

the right was not so limited, but there was no *Edwards* violation. *Edwards* focuses on access to counsel once the right to counsel is asserted. In reviewing the facts and circumstances of the case at bar, the Court is able to determine the scope and extent of Petitioner's invocation of the right to counsel. Clearly, Petitioner invoked his right to counsel. The record reveals Petitioner requested counsel before taking the polygraph examination. Conforming to the dictates and purposes of *Edwards,* Petitioner here, unlike the petitioner in *Edwards,* was able to and did consult with an attorney. Petitioner's counsel allowed Petitioner to take the polygraph examination thereby initiating further interrogation by law enforcement officers. If Petitioner had taken the polygraph test without having had the opportunity to consult with counsel or without counsel's knowledge, perhaps this Court would be inclined to reach a different conclusion. However, in light of the factual record, the Court concludes there was no *Edwards* violation. Petitioner was later Mirandized, failed to invoke his right to counsel, and thereby waived his rights.

Petitioner argues he re-invoked his right to counsel by attempting to contact his attorney after the polygraph test. However, as stated by the Georgia Supreme Court, this act did not reflect an unequivocal desire to deal with law enforcement only through counsel as required to fall under the protections of *Edwards.* But see *United States v. Porter,* 764 F.2d 1, 6 (1st Cir.1985) (petitioner's "attempt to contact his attorney constituted an exercise of his right to counsel."); *Silva v. Estelle,* 672 F.2d 457, 459 (5th Cir.1982) (petitioner's request to be allowed the opportunity to phone his lawyer was an unequivocal assertion of the right to counsel).[54] Petitioner also argues his refusal to sign the waiver of rights form was a re-invocation of his right to counsel; however, the Court concludes otherwise. See *Palmes v. Wainwright,* 725 F.2d 1511, 1517 (11th Cir. 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984) (court rejected petitioner's argument that refusal to sign waiver constituted assertion of right to counsel). The Georgia Supreme Court's ruling was not contrary to clearly established Supreme Court precedent nor did it result in an unreasonable interpretation of the facts.[55]

54. Although decided after the Georgia Supreme Court's ruling, the Court in *Cannady v. Dugger,* 931 F.2d 752 (11th Cir.1991), held petitioner's statement to a law enforcement officer that "I think I should call my lawyer," was an unequivocal request for counsel and petitioner's Miranda rights were violated when the officer asked further questions.

55. Respondent contends the Georgia Supreme Court's ruling was not an unreasonable application of clearly established Supreme Court precedent. To support this argument, Respondent directs the Court's attention to *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). In *Minnick,* the Court held "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153, 111 S.Ct. at 491. *Minnick* does not change this Court's conclusion on the *Edwards* issue. The first part of the Court's ruling is merely a reiteration of the clearly stated rule in *Ed-*

*wards:* when counsel is requested, interrogation must cease. The Court stated, "Even before *Edwards,* we noted that *Miranda's* 'relatively rigid requirement that interrogation must cease upon the accused's request for an attorney ... has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible." *Minnick,* 498 U.S. at 151, 111 S.Ct. at 490. The Court explained that the holdings of *Edwards* and *Miranda* require an attorney's presence at custodial interrogations. *Id.* at 152, 111 S.Ct. at 490. In the case at bar, Petitioner invoked his right to counsel and had the opportunity to have counsel present at the polygraph examination. Therefore, law enforcement officers fulfilled their duty under *Edwards.* Consequently, this Court does not conclude that *Minnick* established a previously unestablished rule applicable to this case.

### D. Confession—Due Process Rights

Petitioner contends inculpatory statements were admitted which were the product of threats, promises and coercion, and such statements violated Petitioner's constitutional privilege against self-incrimination as provided under the Fifth Amendment. The state habeas court concluded claims regarding alleged coercion were precluded from review because they were decided on direct appeal. (Respondent's Ex. No. 2E, p.2030). That court also concluded claims regarding the length of the interrogation were procedurally defaulted. (*Id.*).

With regard to the coercion issue, the Georgia Supreme Court concluded on Petitioner's first direct appeal that the trial court failed to make sufficient findings regarding the admissibility of Petitioner's confession; therefore, the case was remanded. After remand the Georgia Supreme Court concluded Petitioner's agreement to take the polygraph examination was not coerced and that all statements subsequent to the polygraph examination were voluntarily given.

Petitioner must concede that no inculpatory statements were made during the polygraph examination and the results of the test were not admitted in evidence during the trial. However, Petitioner's claim is not limited to coercion surrounding the polygraph test alone. Petitioner contends the entire interrogation, beginning with the polygraph test and ending with his confession, was coercive.

Petitioner's right to be free from compelled self-incrimination is protected by the Fifth Amendment of the United States Constitution. *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). Petitioner's allegations also implicate Petitioner's due process rights under the Fourteenth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also Jackson v.* *Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964) (a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, on an involuntary confession).

▆▆▆▆▆ Petitioner's rights have not been violated only if the Court determines Petitioner's confession was " 'free and voluntary;' that is, . . . not extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Malloy*, 378 U.S. at 7, 84 S.Ct. at 1493. In determining whether Petitioner's confession was free and voluntary, the Court must assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation[,]"[56] including the length of the detention and interrogation, the age of the accused, and whether law enforcement used physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047. "Although at trial the prosecution must establish, by a preponderance of the evidence, that a challenged confession was voluntary, on collateral review, the burden of proving involuntariness rests with the habeas corpus applicant." *Martin v. Wainwright*, 770 F.2d 918, 925 (11th Cir. 1985) (citing *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972)).

Jones, whom Petitioner consulted with prior to the polygraph test, testified that when he talked to Petitioner at the FBI office, Petitioner stated that he had been threatened with revocation of his probation if he refused to take the polygraph test; however, Jones did not testify that he had heard the statement from Sheriff Lee and Sheriff Lee denied making the statement. (Respondent's Ex. No. 1E, pp. 122, 195–196). Sheriff Lee did admit that he prom-

---

56. "[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton*, 474 U.S. at 111, 106 S.Ct. at 450–451.

ised to speak to the district attorney about dropping Petitioner's marijuana charge if Petitioner took the polygraph test and "passed it." (Respondent's Ex. No. 1E, pp. 234–235; Respondent's Ex. No. 2H, Johnson Affidavit, Attachment A–8). When Petitioner was taken to the FBI headquarters he saw his attorney and took the polygraph test which lasted approximately two to three hours. Petitioner returned to the Douglas County jail where, as he contends, he was interrogated unrelentlessly for more than four hours. The interrogation by Wynn and McGinnis began at approximately 8:30 p.m. and lasted two hours. This session was briefly interrupted by a 10 to 15 minute meeting by Petitioner with his parents and sister. At approximately 10:30 p.m. Agent Ingram began questioning Petitioner. Petitioner contends he was physically exhausted and had been in custody for more than eleven hours without sleep when he confessed at approximately 12:20 a.m. Petitioner asserts that the statements made after the initial inculpatory statement were also coerced.

With regard to the length of the interrogation, Respondent contends this aspect of the claim is procedurally defaulted. However, the Court concludes this aspect of Petitioner's claim is not procedurally defaulted. Because the Court is required to look at the totality of the circumstances in determining whether Petitioner's statements were the product of coercion, the length of the interrogation is a necessary element of Petitioner's due process claim. Furthermore, Petitioner did raise the issue in argument in his Second Supplemental Brief to the Georgia Supreme Court. (Respondent's Ex. No. 1U, pp. 20–21).

▪ Nevertheless, the Court concludes Petitioner's inculpatory statements were voluntary and a product of his own free will. With regard to the alleged threat of probation revocation, the Court concludes, as implied in the Georgia Supreme Court's

opinion, there was no such threat made to Petitioner. *Parker*, 256 Ga. at 547, 350 S.E.2d at 573. With regard to the alleged promise to dismiss the marijuana charge, the Court determines this statement by Sheriff Lee was not material to Petitioner's confession which occurred several hours later. Petitioner's confession was voluntary.

▪ Because "the custodial setting is thought to contain inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," a confession is not automatically considered voluntary merely by the fact that the accused failed to assert the privilege against self-incrimination. *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984). Under *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976), a trial court determines if a confession is voluntary by determining whether "the confession was extracted by any sort of threat or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." [57]

Sheriff Lee made no promises to induce Petitioner's confession. Any possible promise related only to taking the polygraph test rather than the substance of any particular verbal or written statement by Petitioner. *Compare, United States v. Taylor*, 792 F.2d 1019 (11th Cir.1986) (assistant state attorney did not bargain with defendant to make particular admissions actually made). Furthermore, there were no statements admitted or given in connection with the polygraph test. With regard to Petitioner's verbal statements, Petitioner was advised of his *Miranda* rights. (Respondent's Ex. No. 1E, p. 159). There is no testimony from Petitioner that he was deprived of food or sleep or was threatened with violence. The record re-

---

57. The rule stated in *Hutto* has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement officers. *Martin,*

770 F.2d at 925–926; *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988); *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir.1997).

veals Petitioner was not inexperienced with regard to such matters and there is no evidence Petitioner's lack of in depth, formal education resulted in any misunderstanding of his rights.

The length of the interrogation in combination with the other facts previously mentioned does not suggest that Petitioner's confession was coerced. Any alleged promise made by Sheriff Lee was not later confirmed by Detective Wynn, Agent McGinnis or Agent Ingram before Petitioner made the first inculpatory statement. *Compare, Leon v. Wainwright,* 734 F.2d 770 (11th Cir.1984) (petitioner's second inculpatory statement given to second set of law enforcement officers was voluntary although first statement was not voluntary in light of first set of law enforcement officers' use of force and threats). The Court cannot conclude the entire sequence of events brought about an involuntary confession. Petitioner was not interrogated for 10 hours straight. *Compare, Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (no coercion in spite of 12 hours of interrogation). Although Petitioner was taken into custody at approximately 1:30 p.m., Sheriff Lee did not question Petitioner until later that afternoon. Petitioner was not interrogated during periods in which he was transported from the FBI headquarters to the Douglas County Jail, and Petitioner was also allowed to meet with his family during the period in which he was interrogated by Detective Wynn and Agent McGinnis. Noticeably absent from the record is any evidence that Petitioner ever requested the interrogation to stop or made any other request that was not heeded. After the first inculpatory statement was given, the interrogation ended. Law enforcement officers did not question petitioner again until approximately one hour and a half later. Consequently, the Court does not conclude

Petitioner's confession was coerced or involuntary.[58]

### E. Right to Competent Expert Psychiatric Assistance

. Petitioner contends he was deprived of competent psychiatric assistance. Respondent argues this claim is procedurally defaulted, and in the alternative, reviewing the merits of this claim would require the Court to apply a new rule of law. The state habeas court declined to rule on the merits of Petitioner's claim regarding the amount of funds awarded and concluded that any claim regarding the competency of the psychiatric expert provided was procedurally defaulted. (Respondent's Ex. No. 2E, p.2035).

■ To determine whether Petitioner has two separate claims: a claim regarding the competency of the psychiatric expert and a claim regarding the amount of funds provided for obtaining a psychiatric expert for trial, the Court must first decide what constitutional rights are afforded a criminal defendant in such a case. As previously stated, *Ake* requires the State to provide access to a psychiatrist when the defendant cannot afford one in order to guarantee the defendant's due process rights. 470 U.S. at 74, 105 S.Ct. at 1091–1092. Petitioner insists that explicit and implicit in the right to expert psychiatric assistance is the right to competent assistance and the issue of competency is inextricably intertwined with the amount of funds awarded by the trial court. However, this Court concludes otherwise. Petitioner attempts to merge his possible Sixth Amendment claim for incompetent or ineffective expert assistance into a Fourteenth Amendment due process claim for the failure to have the opportunity to present a legitimate defense.

---

**58.** *Compare, United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1475 (11th Cir.) *abrogated on other grounds, Coleman v. Singletary,* 30 F.3d 1420, 1423 (11th Cir.1994) (considering the time that passes between confessions, change in place of interrogations, and the change in identity of the interrogators, even if court concluded petitioner's first confession was coerced, second confession was not tainted by first confession and therefore did not require exclusion).

Petitioner contends *Starr v. Lockhart,* 23 F.3d 1280 (8th Cir.1994), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994), supports his contention that the amount of funds awarded for expert psychiatric assistance directly relates to the competency of the expert. In *Starr* by a joint motion an expert evaluated the petitioner for purposes of determining competency to stand trial and insanity at the time of the offense. At trial, the petitioner's counsel requested an additional expert to present testimony at the sentencing phase for the purpose of demonstrating the petitioner's diminished capacity. The petitioner's request was denied. On direct appeal, the petitioner challenged the competency of the expert's evaluation for purposes other than incompetency and sanity. On habeas review, the petitioner argued his rights under *Ake* were violated by the trial court's denial of his request for an additional expert.

In *Starr,* the issue was identical to the issue presented in *Ake,* i.e. whether the State was required to provide expert psychiatric assistance for the purposes of enabling an indigent defendant to present his defense. In *Starr,* the petitioner argued the trial court erred in denying his request for assistance to present a particular defense while simultaneously contending the expert provided was not capable of presenting evidence on that defense. Consequently, in the habeas proceeding, the quality of the expert was not an issue and the claim based on the trial court's denial of the petitioner's request was not procedurally barred.

In the case at bar, Petitioner's claim is based on the quality of the expert provided. The decision in *Ake* does not begin to suggest that the quality of the expert provided is directly correlated to the amount of funds awarded. *Ake* only requires that a competent expert be provided for the purpose of presenting a defense. The Supreme Court emphasized that a defendant does not have a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire one. *Ake,* 470 U.S. at 84–85, 105 S.Ct. at 1096–97.

Therefore, the Court concludes Petitioner's claim based on the competency of the expert provided is separate from a claim based on the amount of funds awarded; and Petitioner's claim regarding competency is procedurally defaulted.

■ Even if Petitioner's claim was not procedurally barred and based solely on Petitioner's due process right to a fair trial, the claim is without merit. According to *Clisby v. Jones,* 960 F.2d 925, 930 (11th Cir.1992), the district court must follow a two-step process in determining whether a defendant's due process rights were violated by the failure to receive competent expert psychiatric assistance. First, the court "examine[s] the information before the court when it is alleged to have deprived the defendant of due process." *Id.* Second, the district court determines "whether that information should have led the trial court to determine the defendant probably would not receive a fair trial." *Id.*

■ Petitioner points to the $300 award as the ruling which deprived Petitioner of his right to a fair trial. However, the information before the trial court at the time of its award should not have led the trial court to conclude the defendant would probably not receive a fair trial. Petitioner relies heavily on the state habeas record to support his conclusion that the award of funds was patently inadequate. However, the Court is limited to the information before the trial court at the time of its $300 award. The Prosecutor did voice his concern that an award of $300 might not be enough. (Respondent's Ex. No. 1E, p. 292). However, this evidence was insufficient to lead the trial court to conclude that Petitioner probably would not receive a fair trial. The Court finds Petitioner's due process rights were not violated at the culpability or sentencing phases of trial. Moreover, Petitioner failed to show testimony from a "competent" expert would have affected the verdict or sentence. Therefore, Petitioner is not entitled to relief on this claim.

### F. Sentencing Phase Instructions—Due Process and Cruel and Unusual Punishment

#### 1. Trial court's instruction on unanimity

██ The state habeas court concluded this claim was procedurally defaulted because it was not timely raised at trial and pursued on direct appeal. (Respondent's Ex. No. 2E, p.2036). Petitioner responds that the general standards regarding preservation of claims do not apply to challenges on habeas review of sentencing phase instructions and the so called procedural default does not rest on an independent and adequate state procedural rule. Petitioner's assertion is correct. *See Cunningham v. Zant,* 928 F.2d 1006, 1011 (11th Cir.1991) ("The state's argument that an adverse inference should be drawn from the fact that Cunningham made no objection to the trial court's charge has no merit. The Georgia Supreme Court has held 'that defendants in criminal cases are not required to except to the jury charge to preserve error for appeal' or for habeas review.") (quoting *Stynchcombe v. Floyd,* 252 Ga. 113, 311 S.E.2d 828, 830 (1984)). Petitioner's failure to raise this claim does not constitute a procedural default of his federal claim in state court. However, this Court concludes Petitioner's claim is without merit.[59]

#### 2. Standard for mitigating circumstances [60]

██ Petitioner contends the trial court's sentencing charge erroneously and misleadingly suggested that Petitioner was required to prove mitigating circumstances beyond a reasonable doubt. Under O.C.G.A. § 17–10–30, evidence of statutory aggravating circumstances must be established beyond a reasonable doubt. Petitioner contends because there is no such requirement for mitigating circumstances before deciding to impose a life sentence, the jury should have been so instructed. Petitioner argues further that because only the standard for aggravating circumstances was mentioned, members of jury naturally concluded that the standard applied to both types of evidence. First, there is no admissible evidence to support Petitioner's belief that the jury was mistaken about the standard of proof for mitigating circumstances. Viewing the trial court's charge as a whole, there was no constitutional error with respect to mitigating circumstances. The Court concludes the Georgia Supreme Court's ruling regarding the sufficiency and propriety of the charge was not contrary to and does not represent an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.[61]

### G. Jury's Reliance on Invalid Aggravating Circumstance in Recommending a Sentence [62]

██ Petitioner argues his due process rights and right to reliable sentencing were violated because the jury relied on the invalidated aggravating circumstance of rape when it recommended a sentence of death. To support this conclusion, Petitioner asserts that no new evidence on the circumstance of rape was admitted at sentencing; therefore, the jury relied on the prior conviction to support its finding of this aggravating circumstance. However, at the beginning of the sentencing phase, the Prosecutor stated, for the record, that

**59.** *See* authorities cited *supra* Part II.B.6.

**60.** The state habeas court concluded this claim was precluded from review; however, this Court must consider the claim.

**61.** Petitioner argues the issue with respect to this claim is whether the trial court's charge misled the jury into thinking that an improper standard of proof applied which constrained the jury's ability to consider mitigating evidence presented by Petitioner. However, that is not the issue. The issue on federal habeas review is whether clearly established federal law required the trial court to give the requested charge.

**62.** The state habeas court concluded this claim was precluded from review. (Respondent's Ex. No. 2E, 2040).

the evidence proffered during the culpability phase was also offered for purposes of the sentencing phase. (Respondent's Ex. No. 1J, pp. 965–966). On review by the Georgia Supreme Court, Petitioner's death sentence was upheld.

Petitioner's claim has its basis in *Stromberg v. People of the State of California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). In that case, the Court reversed a defendant's conviction based on a general jury verdict where members of the jury were instructed that they could find the defendant guilty based on one of three types of conduct described in a statute. When the Supreme Court found one of the descriptive clauses invalid under the Federal Constitution, the Court reversed the defendant's conviction because it was impossible to determine under which clause of the statute the conviction was based.

Petitioner argues his claim is analogous to that in *Stromberg;* however, the case at bar is very different from *Stromberg.* In the case sub judice, Petitioner's sentencing verdict was not general in nature. The jury here was required to specify the basis of its recommendation. Consequently, a reviewing court was able to determine the basis of Petitioner's recommended sentence.

Specifically with respect to sentencing, the Court is guided by *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The issue presented in *Stephens* was whether the Court was required to vacate the respondent's sentence of death because one of three statutory aggravating circumstances found by the jury was subsequently held to be invalid by the Georgia Supreme Court. 462 U.S. at 864, 103 S.Ct. at 2736. Under the law at that time, a sentence of death was authorized if the jury found the offense of murder was committed by a person with a prior record of conviction for a capital felony or who has a substantial history of serious assaultive criminal convictions; the offense was outrageously or wantonly vile, horrible or inhuman; or the offense was committed by

a person who has escaped from the lawful custody of a peace officer or place of lawful confinement. Georgia Code § 27–2534.1(b) (1978). The jury based its recommended sentence of death on all of the aforementioned grounds.

In deciding not to reverse the petitioner's conviction, the United States Supreme Court explained that the Stephens verdict was not merely a general verdict stating that the jury had found one unspecified aggravating circumstance. "The jury expressly found aggravating circumstances that were valid and legally sufficient to support the death penalty." *Stephens,* 462 U.S. at 881, 103 S.Ct. at 2745. Moreover, as explained by Respondent, the aggravating circumstance that was invalidated was not invalidated because of the erroneous admission of evidence or insufficient evidence. The Georgia Supreme Court specifically found the evidence sufficient to support Petitioner's conviction for rape but reversed because of the trial court's failure to give a charge on a lesser included offense. *Parker,* 255 Ga. at 169, 336 S.E.2d at 244.

In the case at bar, the jury's sentencing verdict is not unreliable, arbitrary or capricious. As in *Stephens,* the jury here found an aggravating circumstance that was valid and legally sufficient to support the death penalty. There was no reasonable possibility or probability that the jury's recommended sentence was improperly influenced by the rape conviction. Consequently, the Georgia Supreme Court's ruling with respect to this claim does not entitle Petitioner to the requested relief.

**H. Trial Court's Charge on Kidnapping with Bodily Injury** [63]

Petitioner contends the only statutory aggravating circumstance which survived direct appeal is also invalid, and, therefore, Petitioner's death sentence is invalid. The state habeas court concluded this claim was procedurally defaulted. As with Petitioner's claim regarding the trial court's

---

**63.** The state habeas court found this claim was precluded from review.

charge on unanimity, Petitioner was not required to preserve this claim for habeas review, and the Court is not precluded from reviewing the claim.

Petitioner argues the trial court instructed the jury that simple kidnapping was a statutory aggravating circumstance; however, the trial court did no such thing.[64] The charge sufficiently described the offense at issue and did not permit the jury to exercise "open-ended discretion" in determining whether to recommend death. The trial court instructed the jury on the offense of kidnapping with bodily injury and instructed the jury that aggravating circumstances must be proven beyond a reasonable doubt. Consequently, Petitioner's claim is without merit.

## I. Prosecutor's Closing Argument During the Sentencing Phase

Petitioner argues certain comments made during the Prosecutor's sentencing phase closing argument violated Petitioner's due process rights and right against cruel and unusual punishment. Petitioner takes issue with (1) the Prosecutor's comments regarding Petitioner's mental illness, (2) the Prosecutor's comments regarding the jury's role at sentencing, and (3) the Prosecutor's comments allegedly regarding Petitioner exercising his constitutional rights. The state habeas court concluded Petitioner's claim regarding comments on his mental illness was precluded from review and Petitioner's remaining claims were procedurally defaulted. (Respondent's Ex. No. 2E, p.2038). This Court concludes Petitioner's claims regarding the prosecution's comment on the jury's responsibility at sentencing is procedurally defaulted, and Petitioner failed to show cause and prejudice to excuse the default.

Petitioner contends the claim regarding exercise of his constitutional rights is not procedurally barred because the claim was raised on direct appeal although not decided. Petitioner is correct and the Court concludes Petitioner's claim is not procedurally defaulted. (Respondent's Ex. No. 1Q, p. 16). However, this claim is also without merit. The State did not suggest that Petitioner should be penalized for exercising his constitutional rights. The Prosecutor's argument in this respect served to assure members of the jury that Petitioner's rights had indeed been protected throughout the criminal process.[65] *Compare Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) ("[C]ourt should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that the jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").

▆▆▆ Petitioner's claim regarding the Prosecutor's comments on mental illness did not violate Petitioner's due process rights or fight against cruel and unusual punishment. The Prosecutor did not argue that the jury could not consider Petitioner's mental illness. Petitioner suggests that this Court should find a constitutional violation where the State argues against leniency and for the imposition of the death sentence. However, the Prosecutor is not required to tie his hands during the sentencing phase. Petitioner is not entitled to relief on this claim.[66]

## J. Jury's View of Petitioner in a Holding Cell [67]

▆▆▆ Petitioner contends venire members saw him in the holding cell during

---

64. An excerpt of the trial court's charge on kidnapping with bodily injury is provided above in Part II.B.5.

65. *See* authorities cited *supra* Part II.B.7.

66. *See* authorities cited *supra* Part II.B.7.

67. The state habeas court failed to address this claim. Initially, Respondent asserted that this claim was procedurally defaulted. (Answer–Response, p. 10). However, in its supporting brief, Respondent argues this claim was raised and decided on direct appeal. This Court is not precluded from considering the claim. The claim is not unex-

recesses of voir dire and members of the jury saw him in the holding cell during the trial. On the first appeal to the Georgia Supreme Court, Petitioner's claim was denied. The Court concluded the trial court did not err in placing Petitioner in a holding cell in light of the threats on Petitioner's life. Additionally, the Court explained that Petitioner failed to show that any of the jurors selected had seen Petitioner being placed into the cell or viewed him inside the cell.[68] *Parker*, 255 Ga. at 169, 336 S.E.2d at 243. The record presented to the Georgia Supreme Court supports the finding that jurors had not seen Petitioner in the holding cell. Petitioner also argues the prejudice resulting from viewing Petitioner in the holding cell was not outweighed by the State's interest in protecting Petitioner. In light of the Georgia Supreme Court's conclusion that the jurors did not see Petitioner in the holding cell, there is no basis on which this Court could conclude Petitioner suffered any prejudice. Furthermore, the record sufficiently supports the trial court's conclusion that safety measures were required. Moreover, Petitioner was not in shackles during periods in which he was transported to the cell or placed in the cell.

Petitioner also argues the trial court should have at least explained to the jury why Petitioner was placed in a holding cell and instructed the jury not to consider the

fact when deliberating and reaching a verdict. Again, because the record, on review by the Georgia Supreme Court, did not support Petitioner's conclusion that jurors did see Petitioner in the holding cell, there was no reason for the trial court to provide an explanation or instruction. Moreover, the jury was instructed on the presumption of innocence. (Respondent's Ex. No. 1I, p. 903). The jury also took an oath to give a true verdict according to the evidence. (Respondent's Ex. No. 1H, p. 602).

This Court concludes the Georgia Supreme Court's ruling on this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[69]

## K. Jury Taint from Information about Petitioner's Similar Charges [70]

The Sixth Amendment guarantees the right to a trial by jury and the jury's verdict must be based upon evidence developed at trial. *Turner*, 379 U.S. at 472, 85 S.Ct. at 549. Petitioner contends his due process rights were violated when a member of the venire, Harry Jackson, stated in the presence of four jury panels during voir dire that Petitioner had been "released from a similar situation somewhere[.]" [71] (Respondent's Ex. No. 1G, p.

---

hausted and not barred by the procedural default doctrine because it was decided on direct appeal. Consequently, under Georgia law, the state habeas court should have addressed the claim by explaining that the claim could not be relitigated.

**68.** When this case was before the Georgia Supreme Court on its first appeal, there was no evidence that any venire member or member of the jury had seen Petitioner in the holding cell. However, on review by the state habeas court, Petitioner submitted evidence in the form of a juror affidavit which could be used to support this claim. Although there is evidence in the record on this issue, Petitioner did not assert that the claim was specifically raised in the state habeas proceeding although the substance of the claim was couched in a claim for ineffective assistance of counsel which was specifically raised in the

state habeas proceeding. Because the state habeas court would have been precluded from relitigating this claim, this Court will consider the issue based on the record before the Georgia Supreme Court at the time of the appeal. Even if the Court considered Petitioner's juror affidavit, the evidence only proves that Petitioner was seen in the holding cell. The evidence does not and cannot show that viewing Petitioner in the holding cell affected the verdict or otherwise resulted in prejudice.

**69.** *See* authorities cited *supra* Part II.B.11.

**70.** The state habeas court did not address this issue.

**71.** As a matter of fact, Petitioner was acquitted on charges of choking, molesting and

506). There is evidence in the record that at least two prospective jurors discussed Jackson's response. (Respondent's Ex. No. 1H, p. 542). However, there is no evidence the comment was considered in deliberations. On direct appeal to the Georgia Supreme Court, Petitioner argued the four jury panels who were in the courtroom during Jackson's response should have been disqualified. That court rejected Petitioner's claim.

▮▮▮▮▮ "When jurors consider extrinsic evidence, [relief must be granted] if the evidence poses a reasonable possibility of prejudice to the defendant. Prejudice is not presumed[,] and [t]he defendant has the burden of demonstrating prejudice by a preponderance of credible evidence." *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir.1990) (citations omitted). Once a defendant makes a colorable showing of extrinsic influence, the trial court must investigate the asserted impropriety. *Id.* When the extrinsic information is disclosed before the jury verdict, the inquiry is whether the extrinsic factual matter would likely taint the jury's deliberations. *Id.* at 657, note 2. If the defendant meets his burden, the prosecution must then prove that consideration of the extrinsic evidence was harmless. *Id.* at 657. Petitioner failed to show the jury was prejudiced by Jackson's comment, and Petitioner is not entitled to relief.

▮▮▮ This Court must consider the nature of the extrinsic information and the manner in which it was received in determining whether the defendant has met his burden of demonstrating a reasonable possibility of prejudice.[72] Here, the information was slightly prejudicial because it suggested that Petitioner was, at a minimum,

suspected of a similar crime.[73] This information may have resulted in some prejudice because such information would have been inadmissible at trial. However, the manner in which the information was revealed cuts against its prejudicial impact. Because the comment was not made during trial by a witness from the witness stand but was made in response to a voir dire question, the statement, although perhaps prejudicial, is much less prejudicial taken in its context. Furthermore, Jackson's comment was ambiguous in that he did not state that Petitioner had been previously charged with a crime or had gone to trial on any particular charge. Essentially, the jury was not exposed to Petitioner's prior charges.

As required under *Rowe*, the trial court questioned each individual member of the four panels to determine whether anything they had heard or seen during the week had changed or altered any response previously given during voir dire.[74] (Respondent's Ex. No. 1H, pp. 552 – 567). No one answered in the affirmative, and the trial court's method was proper. *See United States v. LaSpesa*, 956 F.2d 1027, 1033 (11th Cir.1992) ("[T]he district court has broad discretion to choose the 'inquisitorial tools ...' Necessary and appropriate to determine prejudice where juror misconduct or extrinsic influences are alleged." (citations omitted).). The trial court properly concluded that any more detailed questioning would have emphasized the inappropriate response. *Compare, Id.* (where content of law clerk's remark to members of the jury during recess of trial were not in dispute and extent of circulation was not in dispute, court did not err in conducting a full evidentiary hearing).

---

leaving for dead a young girl in the State of Florida. (Respondent's Ex. No. 1H, p. 539).

**72.** *But see Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997) (in deciding prejudicial information claim, court found "no defensible distinction to be made based solely on the source of the information" rather than focusing on the nature of the information itself).

**73.** Petitioner concedes that he was previously acquitted on similar charges.

**74.** *Compare, United States v. Small*, 891 F.2d 53 (3rd Cir.1989) (where trial court was informed of possible exposure to extraneous prejudicial information, trial court conducted individual voir dire and did not give a curative instruction; Court of Appeals held trial court did not commit reversible error).

Furthermore, the overwhelming evidence supporting the prosecution's case makes Jackson's comment insignificant.

In summary, Petitioner failed to demonstrate the existence of a reasonable possibility of prejudice from Jackson's comment or taint to the jury's deliberations.[75] The Georgia Supreme Court's ruling on the issue did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**L. Presence of Deputy Sheriff/Prosecution Witness in Venire**

 Petitioner claims the presence of one of the State's witnesses in the venire

tainted the jury. Petitioner did not raise this claim on direct appeal and the state habeas court found this claim procedurally defaulted. (Respondent's Ex. No. 2E, p.2033). Petitioner responds that there is adequate cause to excuse the default. However, this Court previously concluded adequate cause did not exist. Consequently, Petitioner's claim is procedurally defaulted and the Court will not review the merits.

## IV. ORDER

Petitioner failed to show he is entitled to relief under 28 U.S.C. § 2254, and the Petition for Writ of Habeas Corpus is **DENIED.**

**SO ORDERED.**

---

**75.** *Compare Thompson v. Borg,* 74 F.3d 1571, 1573–74 (9th Cir.1996), *cert. denied,* 519 U.S. 889, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996) (venireman's response to defendant's voir dire question which stated that he read the defendant had "pleaded guilty at one time and changed it" did not implicate the right to confrontation, cross examination or counsel; assuming failing to grant mistrial in such case was constitutional error, the defendant/petitioner failed to show prejudice).